Wright, Circuit Judge, dissented from affirmance of convictions of first-degree murder.

Wilbur K. Miller and Bastian, Senior Circuit Judges, and Danaher and Burger, Circuit Judges, dissented from setting aside of death sentences and from directions that each defendant be resentenced to life imprisonment.

**Joseph C. FRADY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Richard A. GORDON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 18357, 18358.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 2, 1964.

Decided May 7, 1965.

Certiorari Denied Nov. 8, 1965.

See 86 S.Ct. 247.

Mr. Henry Lincoln Johnson, Jr., Washington, D. C., for appellants.

Mr. David C. Acheson, U. S. Atty., with whom Messrs. Frank Q. Nebeker, William H. Collins, Jr., and Anthony A. Lapham, Asst. U. S. Attys., were on the brief, for appellee. Mr. Jerome Nelson, Asst. U. S. Atty., and Mr. Daniel H. Benson, Attorney, Department of Jus-

tice, also entered appearances for appellee.

Mr. Anthony G. Amsterdam, Washington, D. C., appointed by this court, argued as amicus curiæ.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and FAHY, WASHINGTON, and DANAHER, Circuit Judges, and BASTIAN, Senior Circuit Judge, and BURGER, WRIGHT, and MCGOWAN, Circuit Judges, sitting *en banc*.

PER CURIAM.

██ The judgments of conviction of first degree murder and of robbery are affirmed. The death sentences are set aside with directions that each appellant be resentenced to life imprisonment on the verdicts of guilty of first degree murder. Circuit Judge Wright dissents from the affirmance of the convictions of first degree murder. Senior Circuit Judge Wilbur K. Miller, Circuit Judge Danaher, Senior Circuit Judge Bastian, and Circuit Judge Burger dissent from the setting aside of the death sentences and from the directions that each appellant be resentenced to life imprisonment.

It is so ordered.

TAMM, Circuit Judge, took no part in the consideration or decision of these cases as he was not a member of the court when the cases were considered and decided.

LEVENTHAL, Circuit Judge, took no part in the consideration or decision of these cases.

FAHY, Circuit Judge, with whom BAZELON, Chief Judge, and WASHINGTON and WRIGHT, Circuit Judges, join, except that for reasons stated in his separate opinion Judge WRIGHT does not join in Part I: Appellants Joseph Frady and Richard Gordon, then twenty-two and eighteen years of age, respectively, were convicted of first degree murder in the killing of one Thomas Bennett with deliberate and premeditated malice. 22 D.C.Code § 2401.[1] They are under sentences of death. For the reasons stated herein and in the opinion of Circuit Judge McGowan the death sentences are set aside and, exercising its authority under 28 U.S.C. § 2106,[2] the court directs the imposition of life imprisonment, the only sentence other than death that can be imposed for first degree murder.

I.

The problems involved in affirming the convictions are fully discussed in the opinions written by Circuit Judge Wilbur K. Miller, for affirmance, and by Circuit Judge Wright, for reversal. The most troublesome contention for reversal is directed to the sufficiency of the evidence to support the jury's conclusion beyond a reasonable doubt that the homicide was "of deliberate and premeditated malice."

1. The indictment also charged homicide while perpetrating a robbery, of which appellants were acquitted, and robbery, of which they were convicted. We affirm the robbery convictions and sentences.

After submission of the cases to the court *en banc* a majority of the court requested memoranda on the following questions: (1) the adequacy of the poll; (2) whether or not 22 D.C.Code § 2404 requires the presentation of specific evidence to the jury bearing on punishment, and if so, by what procedure or at what point in the proceedings should such information be given; and (3) the judgment this court should render, dependent upon the answer to the foregoing questions. Counsel was appointed as *amicus curiæ* to assist the court in these matters.

After memoranda were filed, and at the request of the United States, the cases were reargued to the court *en banc*. We express our special indebtedness to *amicus curiæ* for his memorandum and argument, as well as to counsel for appellants and to the United States Attorney.

2. 28 U.S.C. § 2106 (1958):

"The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

A majority of the court concludes that the evidence was sufficient.

## II.

The sentences of death are a different matter. In my view they have been erroneously imposed. I now explain why.

22 D.C.Code § 2404, as amended March 22, 1962, abolished in this jurisdiction the mandatory death sentence for first degree murder. The punishment now turns upon jury action. It is death "unless the jury by unanimous vote recommends life imprisonment" or if the jury "having determined by unanimous vote" that the defendant is guilty of first degree murder "is unable to agree as to punishment it shall inform the court and the court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment." The text is set forth more fully in the margin.[3]

Congress thus transferred to the jury responsibility theretofore lodged in the statute which made the death sentence mandatory. In considering how this new jury responsibility was sought to be guided in these cases I find two errors which require the death sentences to be set aside.

(1) The first error discussed is the court's instruction to the jury that "in order to return a verdict it is necessary that each juror agree thereto * * *. Your verdict must be unanimous." The full context of the particular instruction is set forth in the margin.[4]

This instruction, although intended to guide the jury in considering the issue of guilt, was given without qualification as though applicable to the punishment as well. But there is no need for agreement as to punishment. Unanimity is required only for a verdict of guilty or not guilty. Lack of unanimity as to punishment is altogether in order.

Earlier in the charge, it is true, the jury was instructed that each juror was to make an individual decision as to penalty and that lack of agreement should be reported to the court. But this did not cure the strong suggestion to seek unanimity. As the Supreme Court stated in Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055, with respect to instructions which similarly could have been misunderstood,[5] "[i]n death cases doubts such as those presented here should be resolved in favor of the accused." 333 U.S. at 752, 68 S.Ct. at 886.

---

3. 22 D.C.Code § 2404 (Supp. IV, 1965) reads in pertinent part:

"The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury, having determined by unanimous vote the guilt of the defendant as charged, is unable to agree as to punishment it shall inform the court and the court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment."

4. "THE COURT: Now, you are directed that your verdict must be the considered judgment of each juror. In order to return a verdict it is necessary that each juror agree thereto—suppose you don't read these verdicts for a moment. I will take them up with you.

"Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so

without violence to individual judgment. Each of you must decide the case for yourself but do so only after a consideration of the evidence with your fellow jurors.

"In the course of your deliberations do not hesitate to change an opinion when convinced it is erroneous but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of the other jurors or for the mere purpose of reaching a verdict."

5. The Supreme Court held that the federal first degree murder statute (then 18 U.S.C. § 567 and now 18 U.S.C. § 1111) required a unanimous decision by the jury upon both guilt and whether death should be imposed. But the Court reversed because the instructions given could well lead a jury to "reasonably conclude that, if they cannot all agree to grant mercy, the verdict of guilt must stand unqualified." 333 U.S. at 752, 68 S.Ct. at 886.

It is true also that on the written forms of special verdicts, to be discussed more fully hereinafter, the court provided a place to express disagreement on punishment, and carefully instructed the jury on the use to be made of the forms. But a place to express disagreement does not dispel the effect of an instruction designed to achieve agreement. I readily recognize that in considering the instructions and forms as a whole the jury may have understood the difference between their functions as to guilt on the one hand and punishment on the other. But a doubt lingers in seeking now to assess the effect of the questioned instruction. If the doubt is left unresolved it leads to death. In resolving it, as must be done, life is favored.

(2) The second error impairing the validity of the death sentences has to do with the poll. The court had supplied each juror with a mimeographed form of special verdict to be filled out according to the conclusions reached, or not reached, as to both guilt and punishment. Three forms of special verdicts were given to each juror, covering the several counts in the indictment and the possible verdicts. The form for count one, charging first degree murder of deliberate and premeditated malice, reads as follows:

"FIRST COUNT          VERDICT .......
"First Degree Murder ...............

> (Possible Verdicts:
> 1. Not Guilty.
> 2. Guilty as charged of First Degree Murder.
> 3. Guilty as Charged of First Degree Murder with recommendation of Life Imprisonment.
> 4. Guilty as charged of First Degree Murder with the jury unable to agree as to punishment.
> 5. Guilty of Murder in the 2nd Degree.
> 6. Guilty of Manslaughter.

"(NOTE: If the Jury returns a verdict of Guilty as charged of First Degree Murder (being No. 2), and makes no recommendation as to Life Imprisonment and

does not state that the Jury is unable to agree as to punishment, the Court *must* under the Law, sentence the defendant to death by electrocution.

"If the Jury returns a verdict of Guilty as charged of First Degree Murder with recommendation of Life Imprisonment (being No. 3), the Court *must* sentence the defendant to Life Imprisonment.

"If the Jury returns a verdict of guilty as charged of First Degree Murder with the Jury unable to agree as to punishment (being No. 4), the Court will thereupon have the duty to fix the penalty and will impose either a sentence of death by electrocution or a sentence of life imprisonment at the *discretion of the Court.*"

It will be seen that the text of the No. 2 verdict does not in terms refer at all to punishment. This vital matter is left to an explanatory note. After the jury returned to the courtroom from their deliberations, a copy of the forms was handed to the deputy clerk by the foreman. On the form pertaining to first degree murder of deliberate and premeditated malice the foreman had written after "Verdict" the words "Guilty as charged of First Degree Murder." He alone had signed the forms handed to the deputy clerk as the official verdicts. The record shows the following took place at this time:

> "Deputy Clerk: Will the foreman please stand. (The foreman stood.)

> "Deputy Clerk: Mr. Foreman, is the jury agreed upon a verdict?

> "Foreman: We have. (The verdicts were handed to the deputy clerk.)

> "Deputy Clerk: Members of the jury, your foreman says that you find the defendant Joseph C. Frady not guilty on Count 2, guilty as charged of first degree murder on Count 1 and guilty as charged on Count 3;

> "That you find the defendant Richard A. Gordon not guilty on Count 2, guilty as charged of first

degree murder on Count 1 and guilty as charged on Count 3;

"And that is your verdict, so say you each and all? (The jurors, in unison, indicated in the affirmative.)"

As I have said the judge in his oral instructions carefully explained the forms and how they should be used. Nevertheless the form actually used in returning the murder verdict of guilty is not as well designed to avoid uncertainty as the form used in United States v. White, 225 F.Supp. 514, 523 (D.D.C. 1964). Judge Youngdahl there stated:

"It is fairest to the defendant for the jury to have the full range of clearly distinguished alternatives before them for consideration at one time. Thus this Court submitted a verdict form which read:

" 'Guilty of First Degree Murder, punishment of Death ————;

" 'Guilty of First Degree Murder, punishment of Life Imprisonment ————;

" 'Guilty of First Degree Murder, unable to agree as to punishment ————;

" 'Guilty of Second Degree Murder ————;

" 'Guilty of Manslaughter ————;

" 'Not Guilty ————.' "

In this form each juror is faced with the necessity of expressing himself in the verdict with respect to punishment. However, the verdict rendered by the foreman in the present cases need not be discussed further; for in any event the death sentences do not survive the poll that followed the written verdicts handed to the clerk by the foreman.

A poll was requested and taken as authorized by Rule 31(d), Fed.R.Crim.P.[6] In conducting it the clerk asked each

juror "What say you as to the defendant (naming each) on Count 1?" Nothing more. Each juror answered "Guilty as charged of first degree murder." Nothing more. No additional instruction had preceded the poll. No word was said by judge or clerk as to what each juror's position might be as to punishment. And the previous suggestion of the court of the need for unanimity was not removed. No question was put respecting punishment. No answer was given respecting punishment, unless we assume each juror silently carried into his answer all that was written on the special verdict and all that had been said by the judge about it.

I am unwilling to assume that each juror by his silence thus decreed or agreed to death. Under our amended Code, placing upon each juror the responsibility of weighing life imprisonment against the death penalty, the poll must explicitly exact certainty as to the position of each juror. His position is not to be left either to inference or silent reference to a form used in the previously rendered special verdict. Disagreement might be manifested by explicitness. Indeed, a juror might be disclosed to be uncertain as to the punishment, and not merely in disagreement with his fellows. He is required neither to be certain nor in agreement. He may remain in doubt as well as disagree.

To repeat, the death sentences have been imposed in these cases on the theory that the Note on the written form was carried over in silence into the spoken answer "Guilty as charged of first degree murder," which considered alone does not speak of punishment. This leaves death to depend upon uncertainty where certainty is essential.

"The practice of long standing [of polling the jury] requires each juror to answer for himself, thus creating individual responsibility, *eliminating*

6. This Rule provides:
"When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged."

*any uncertainty* as to the verdict as announced by the foreman."

State v. Vaszorich, 13 N.J. 99, 126, 98 A.2d 299, 314, cert. denied, 346 U.S. 900, 74 S.Ct. 219, 98 L.Ed. 400 (1953), citing from State v. Cleveland, 6 N.J. 316, 322, 78 A.2d 560, 563, 23 A.L.R.2d 907 (1951). (Emphasis in *Vaszorich* opinion by William J. Brennan, Jr., J.)

In State v. Cleveland, *supra,* the verdict announced in open court by the foreman had specified that the jury found defendant guilty of first degree murder. And no juror dissented from the clerk's statement summarizing the result of the poll that "[y]ou say you find the defendant guilty of murder in the first degree, as rendered by your Foreman, and so say you all." But the jurors in answering the poll had failed to specify the degree of murder of which they found the defendant guilty. The court held this to be reversible error saying:

"We know of no authority creating an inference because a juryman fails to dissent nor are we cognizant of any practice which makes his failure to dissent or mere silence the equivalent of a full finding as proclaimed by the statute.

\* \* \* \* \* \*

"The question involves more than a technical violation of a statute or rule of procedure. It is a matter 'of utmost gravity' as it adjudicates not alone the guilt of the defendant but carries with it the punishment of death. Such a determination cannot be left to inference. The finding must be specific and in exact accord with the statutory mandate."

6 N.J. at 323–325, 78 A.2d at 563–564. This position was reaffirmed in State v. Butler, 27 N.J. 560, 143 A.2d 530 (1958).

In a similar factual situation the same result was reached in Williams v. State, 60 Md. 402, 403 (1883). And see Wilson v. State, 93 Ga.App. 375, 91 S.E.2d 854, 856 (1956); Blankenship v. State, 112 Ga. 402, 37 S.E. 732 (1900); and State v. Boger, 202 N.C. 702, 163 S.E. 877 (1932).

Although the cases cited are not on all fours with the present ones, they make clear that no inference can be drawn from a juror's silence or failure to dissent from the verdict as announced by the foreman. The same rationale prohibits here the imposition of death sentences by reason of an inference from silence in the poll itself.

"[E]ach juror should be put to the individual test, and made to respond solus, without assistance, and without accompaniment. He may be unwilling to agree to the verdict when he is questioned by himself, though he might agree if allowed to do so with the support of 11 other concurrent responses."

Blankenship v. State, supra, 112 Ga. 402, 404, 37 S.E. 732. See Miranda v. United States, 255 F.2d 9, 18 (1st Cir. 1958); State v. Thursby, 245 S.W.2d 859, 863 (Mo.1952).

A deficiency in the poll is not cured by the completeness of the verdict previously announced by the foreman.[7] The reading of a verdict does not afford the same protection to the accused a poll is designed to provide. A juror who concur in the juryroom, out of weakness and against his conscience, in the verdict of eleven other jurors, may express his real opinion as to punishment when given a clear opportunity in open court in the presence of the defendant. This is especially true under our statute, note 3, *supra,* which calls for consideration

---

7. This would appear to be so whether one regards the verdict announced on the poll as completely superseding the verdict previously read by the foreman, see Solar v. United States, 86 A.2d 538, 540 (D.C. Mun.App. 1952), or merely as supplementing the previously announced verdict, see State v. Vaszorich, *supra,* 13 N.J. 99, 125–128, 98 A.2d 299, 313–314; for even under the latter theory each juror's response to the poll must be sufficiently complete as to "be unmistakable in meaning and clearly indicate his assent to the verdict announced by the foreman," thus "eliminating any uncertainty."

and decision of punishment separate from the consideration and decision as to guilt.

A poll takes on special importance in a case where the verdict determines not only guilt but whether the punishment will be death or life imprisonment. See Askew v. State, 118 So.2d 219 (Fla. 1960).[8] I refer again to State v. Cleveland, *supra*, where the court noted the necessity that the degree of murder, and hence determination of life or death, be specified in the poll. The court quoted from another New Jersey case, State v. Cooper, 2 N.J. 540, 550, 67 A.2d 298, 302 (1949):

> "The death sentence cannot be pronounced unless the verdict is definitive of the degree of guilt which entails that penalty. Not only is it understandable that the Legislature deemed it essential that in resolving an issue involving the death penalty or life imprisonment, the finding be specific and not left to conjecture; it is inconceivable that it would not have so provided."

6 N.J. at 323, 78 A.2d at 564; and see Commonwealth v. Martin, 379 Pa. 587, 593, 109 A.2d 325, 328 (1954). *Cf.* Andres v. United States, supra, 333 U.S. at 752, 68 S.Ct. 880, 92 L.Ed. 1055.

The conclusion I draw is that once a poll is demanded the court has a duty under our present Code to inquire of each juror as to his assent to each essential element in the verdict. When the verdict is guilty of first degree murder this includes inquiry as to each juror's position on punishment. Only in this manner can the court be certain that each juror understood the consequence of his verdict as it bears upon punishment.

### III.

Since the convictions are free of reversible error, although the death sentences were invalidly imposed due to (1) the instruction as to the need for unanimity and (2) the inadequacy of the poll, I consider now how this court should dispose of the appeals.

First, as has been stated, the convictions are affirmed. They are not affected by the errors which affect the sentences.

As to the sentences, there are only two sentences possible for first degree murder, either death or life imprisonment. For the reasons stated herein and by Judge McGowan for himself and our brethren who concur with him the death sentences cannot stand. It is impossible, and impermissible, to reconvene the same jury to consider now the punishment. And a new jury is not required to be convened for that purpose, assuming a jury other than the trial jury could validly perform the sentencing function under our Code. Furthermore, since the problem of punishment depends upon jury action—for the trial judge may decide the punishment only after the jury is unable to agree, as to which there was no certainty due to the errors referred to—a remand of the case to the trial judge to determine the punishment is not required. Perhaps that could be done within the latitude permitted by 28 U.S.C. § 2106, *supra*; but the same latitude authorizes this court to make a final disposition of the cases. Were the trial judge's discretion with respect to the punishment for first degree murder broader than it is, and were his function in that regard disassociated from the jury's action, perhaps the court should remand for the exercise of his discretion. But since only one sentence other than death is possible under the statute itself,

---

8. In the *Askew* case after the jury returned a verdict of guilty of rape requiring the death sentence, a poll disclosed that two jurors had agreed to the verdict only if it were accompanied by a recommendation for mercy. The trial judge then sent the jury back for further deliberation in accordance with a Florida statute and the jury again returned a verdict of guilty without recommendation. Polls have in other cases revealed doubt or lack of unanimity in the verdict announced by the foreman. Cannon v. Commonwealth, 291 Ky. 50, 163 S.W.2d 15 (1942); Solar v. United States, 86 A.2d 538 (D.C.Mun.App. 1952).

life or death dependent upon jury action which in these cases was not correctly guided, resulting in death sentences which cannot be sustained, the appropriate solution is for this court, acting under Section 2106, to direct the entry of the only alternative sentences permitted by law. Since it is not possible to reconstruct the situation as it might have been but for the errors referred to, or to leave the death sentences in effect, resort is had to the punishment of life imprisonment, the only alternative. This, to quote the language of Section 2106, is "just under the circumstances." [9]

McGOWAN, Circuit Judge.

I share the view that the convictions of appellants should be affirmed. With respect to the punishment to be imposed for the crime of murder, I concur in the result reached in Judge Fahy's opinion, not because I believe there were errors in the instructions or the polling of the jury, but because the same result flows in this case from the view I hold as to the procedure which should be followed in determining punishment under this statute. For the Government has indicated that the entry of a judgment of life imprisonment would be a proper course, in the event that the procedure employed in this case is thought to have been inadequate.

Whenever a jury is given the function of deciding guilt or innocence in a capital case, and is further accorded the responsibility of choosing between death and life imprisonment as the punishment to be imposed, it seems to me that the cause of enlightened and efficient criminal administration is best served by a two-stage trial.[1] In the first stage, the inquiry is focussed upon the issue of whether the defendant is guilty as charged. In the second, the jury takes up the matter of the penalty to be exacted. It is obvious that evidence relevant to the one may well be unrelated to the other. It is equally obvious that inability to adduce evidence as to both can operate to the prejudice of both the defendant and the public in the elucidation of those considerations entering most directly into any assessment of punishment which seriously purports to have been arrived at by rational means.

From the defendant's standpoint, the jury's deliberations upon his punishment are less than adequately informed if his right of allocution has not been meaning-

9. Judges Fahy and Washington reserve their positions on the question of procedure in determining punishment under 22 D.C. Code § 2404, deeming the question unnecessary to be answered in disposing of the appeals.

1. The legislatures of four states, and the authors of the MODEL PENAL CODE, have endorsed a split-verdict procedure. See CAL.PEN.CODE § 190.1 (enacted 1957); GEN.STAT.CONN. § 53–10 (1963 Supp.) (enacted 1963); N.Y.PENAL LAW, McKinney's Consol.Laws, c. 40, §§ 1045, 1045–a (enacted 1963); PA.STAT.ANN. tit. 18, § 4701 (1963) (enacted 1959); MODEL PENAL CODE § 210.6 (Proposed Official Draft, May 4, 1962). Moreover, the great weight of recent authority supports the conclusion that, whether sentencing is the responsibility of the judge or of the jury, rational determination of punishment requires that the sentencing authority have access to more information about the defendant than will be contained in the record of the trial of his innocence or guilt. See, e.g., MODEL PENAL CODE § 210.6, comment (Tent. Draft No. 9, 1959); N.Y. STATE TEMPORARY COMMISSION ON REVISION OF THE PENAL LAW AND CRIMINAL CODE, INTERIM REPORT 15–16 (1963); ROYAL COMMISSION ON CAPITAL PUNISHMENT 1949–1953 REPORT 6, 12–13, 194–207 (Cmd. No. 8932, 1953); Handler *Background Evidence in Murder Cases*, 51 J.CRIM.L., C. & P.S. 317, 321–327 (1960); Hart, *Murder and the Principles of Punishment: England and the United States*, 52 NW.U.L.REV. 433, 438–439 (1957); Knowlton, *Problems of Jury Discretion in Capital Cases*, 101 U.PA. L.REV. 1099, 1109, 1135–1136 (1953).

For the collection of this and other relevant information, and for a comprehensive analysis of the issues involved— all assembled and provided under rigorous time pressures and without prospect of tangible reward—I am sensible of great obligation for the response made by *amicus* to our appointment. My feelings in this respect are, I am sure, shared by the entire court.

fully available and if facts of a mitigating nature are not before it. By the same token, the government should be able to apprise the jury of any and all circumstances which bear upon the penalty. In many instances, of course, such circumstances will be of an aggravating nature which in no event should become known to the jury prior to its resolution of the issue of guilt. It has never been clear to me how, absent a two-stage procedure, there can be a satisfactory accommodation of these diverse interests. Such an accommodation impresses me as most desirable, even if the Constitution be not thought to require it. If the pace of procedural improvement in the administration of criminal justice must march always to the measure of the Constitution, progress may be slower than it need be. The great office of the Constitution in this area is to set minimum standards. It does not forbid the ingenuity in procedural improvisation which it could not command.

The problem for me, therefore, is not one of the merits of the two-step procedure, but whether it may appropriately be adhered to by this court in the absence of explicit legislative provision for it. There would also be a serious question of policy presented for this or any court considering the initiation of the two-step procedure in the face of a clear indication of unmistakable legislative antipathy to it,—a question which I, in common with *amicus,* think should doubtless be answered in favor of inaction. I agree also with *amicus,* however, in believing that, although Congress did not provide in terms for the two-step procedure in 22 D.C.Code § 2404, neither can it be said to have set its face against the employment of that procedure in the implementation of this statute.

The Judicial Conference of this Circuit may take pride in the fact that the impetus to change in the archaic D. C. mandatory death sentence law came from it. On May 22, 1959, it resolved that mandatory capital punishment should be abolished, leaving the matter of ways and means to be considered further by its committee on the subject. On this same day Senator Keating brought the Conference's resolution to the attention of the Senate; and, a few days later, he introduced a bill (S. 2083, 86th Cong.), which, although retaining the death penalty as the basic punishment for first degree murder, authorized the judge to impose a sentence of life imprisonment if the jury so recommended. In a statement accompanying the introduction of his bill, Senator Keating made it clear that, although his proposal followed the practice then extant in his home state of New York, he had no unyielding position with respect to mechanics and he alluded, as worthy of consideration, to a procedure advanced by the American Law Institute whereunder a separate hearing on punishment would follow upon a determination of guilt. An advantage of this, so he remarked, was that "it would permit evidence to be presented on the issue of punishment which might not be admissible in the trial of the actual offense." 105 CONG.REC. 9393 (1959). Thus it is evident that Senator Keating, one of the most persistent and influential of those members of the Congress moving to reform the D. C. law, was not repelled by the two-stage procedure.

Later in the year (*i. e.,* November 16, 1959), the Circuit Judicial Conference Committee reported to the Conference. In contrast with Senator Keating's bill, it made the punishment for first degree murder life imprisonment *unless* the jury unanimously recommended death; and, even in the latter event, the judge was authorized and directed to impose a sentence of either death or life imprisonment after, and only after, conducting "such proceedings as may be provided by rule of court for the ascertaining and considering of all facts and circumstances relevant to the question of punishment." The Circuit Conference adopted this report; and this approach was also approved by the Judicial Conference of the United States. A bill embodying it (H.R. 11263, 86th Cong.) was introduced on March 18, 1960.

This last-named bill was the subject of hearings by a subcommittee of the House District Committee which eventuated in the preparation by the subcommittee of an entirely new bill (H.R. 12483, 86th Cong.) ; and the latter was reported to the House without amendment by the full Committee. The language of this bill is very close to what eventually emerged as the statute with which we are presently concerned. It contained the provision for the hearing by the judge of evidence in mitigation or aggravation in the cases of those persons convicted prior to the effective date of the law but as to whom the death sentence had not yet been carried out. On the floor, a committee amendment was offered and adopted, providing that, if the jury disagreed on punishment, the judge could sentence the defendant to either death or life imprisonment. This change, which was agreed to and the bill passed on June 27, 1960, brought the measure completely into line with what is now 22 D.C.Code § 2404.

Meanwhile, back in the Senate, Senator Keating had informed his colleagues on March 22, 1960, that the Judicial Conference of the United States had come up with a bill reflecting an approach different from that taken in his S. 2083. Reiterating his overriding concern to be with the end, and not the means, of getting rid of mandatory capital punishment in the District of Columbia, he stated his lack of objection to the Conference's bill. H.R. 12483, upon its arrival from enactment in the House, went to the Senate District Committee, which approved it without amendment. The committee report said that it had examined three proposals in all (i. e., S. 2083, the Judicial Conference draft bill, and H.R. 12483), and that it had fixed upon the last as an appropriate means of realizing Senator Keating's wholly commendable objective, namely, the termination of the District's dubious distinction as the sole remaining American jurisdiction with mandatory capital punishment.

The 86th Congress rose without final Senate action on this measure. The convening of the 87th Congress saw its introduction in identical form in both House and Senate. It was eventually enacted by both Houses without significant change, and after a debate in the Senate which was generated by unsuccessful efforts to make this the occasion for the complete abolition of capital punishment in the District of Columbia. In turning aside these efforts, the proponents of the bill relied heavily upon the fact that, as Senator Keating put it, their proposal would assist law enforcement "by adding an element of judgment and discretion to cases involving capital punishment." 108 CONG.REC. 3982 (1962).

I do not think it far-fetched to infer that an explicit legislative purpose to commit the issue of life or death to the exercise of "judgment and 'discretion" comprehends procedures calculated to make that exercise as informed as possible. At the least there is no inherent incompatibility which would cause a court to think that the Congress was actively opposed to the use of a two-step procedure in the administration of this statute. Dean Wigmore, surely no member of the *avant garde* in the area of criminal law, argued forcefully many years ago that the courts should, without waiting for legislative action, take the lead in devising procedural methods to cope with this matter of the essential differences between an inquiry into a defendant's guilt of first degree murder and the question of whether the penalty should be death or life imprisonment. No agency of government is better equipped than the courts to prescribe procedures for the trial of lawsuits. They have immemorially been thought to have not only the authority to act independently in this area but, indeed, a responsibility to do so.[2]

---

2. See I WIGMORE, EVIDENCE § 194b, at 660–661 (3d ed. 1940).

In United States v. White, 225 F.Supp. 514, 523 (D.D.C.1963), Judge Youngdahl rejected the defendant's claim that his trial should have been held in two stages, with the opportunity to present evidence "in mitigation and extenuation" after the

It is said that our own Circuit Judicial Conference considered and rejected the two-stage procedure, and that we should not go counter to that determination, at least without express Congressional authorization. It is true that the report of the Circuit Conference Committee noted that the committee had considered and rejected the two-stage jury hearing. But this was in the context of a proposal that the punishment for first degree murder should be life imprisonment *unless* the jury recommended death; and, as the committee noted, its rejection of the two-step procedure was intended to require the jury to take the extraordinary step of recommending death "only on the basis of the evidence received at the trial,"— evidence which would, thus, be devoid of anything of an aggravating nature not directly reflected in the commission of the crime charged. Even if the jury took this step, however, the committee was not prepared to permit this action to be final. The judge was still to have the power to decide between death and life imprisonment, but *only after a hear-*

*ing* in which there were to be adduced "all the facts and circumstances relevant to punishment, as in other cases." Thus the committee's essential policy determination was that no person found guilty of first degree murder should be sentenced to death without a separate hearing in which all evidence relevant to punishment was to be brought out. Under the committee's approach, this separate hearing would have been before a judge. If the committee had known that its approach was to be rejected by the Congress in favor of enlarging the jury's role in the choice of punishments, it seems not unlikely that it would have wished a separate hearing to be held better to inform the jury's discretion.

Thus it does not seem warranted to attribute either to our own Circuit Conference or to the Judicial Conference of the United States a disrelish for the two-step procedure under any and all circumstances. And, as indicated above, neither do I find in the legislative record any affirmatively hostile attitude towards it on the part of Congress. I think, there-

jury had reached a decision on the issue of guilt. Finding no mention of such a procedure in the statute, he concluded that "it should not be implied." But he did so on the assumption that the defendant could introduce character evidence relevant to the choice of punishment before the jury rendered a verdict. And he further noted that, in the case before him, the defendant's objection was moot, since the jury had been unable to agree on punishment and a sentence of life imprisonment had been imposed by the court. The New Jersey Supreme Court was confronted with the same argument with respect to the New Jersey discretionary death penalty statute in State v. Mount, 30 N.J. 195, 152 A.2d 343 (1959). That court concluded that a two-step procedure was not necessary, for "nothing in the terms of our present legislation [citations omitted] * * * directs the exclusion of general background testimony and we believe that, pending further legislative enactment, the interests of justice will be best served if our trial judges exercise their judicial discretion so as to permit defendants in murder cases to introduce such background evidence within reasonable limitations." 30 N.J. at 219, 152 A.2d at 355.

Clearly, both Judge Youngdahl and the New Jersey court thought the jury's determination of punishment should be informed by evidence in addition to that relevant only to the issue of guilt. But the alternative they espoused carries with it the very risks of prejudice and confusion that only a two-step procedure can eliminate. It is not enough, in my view, that the jury merely be exposed to information pertinent to the issue of punishment. We can only have confidence in the reason and integrity of their choice when that exposure follows, rather than interrupts, their consideration of the defendant's guilt. To the extent that Judge Youngdahl's reluctance to follow a split-verdict approach rests on the belief that Congress intended that there be but a single verdict, my reading of the legislative history leads me to the conclusion that Congress did not consciously address itself to the problem. And, absent any contrary Congressional expression, in matters involving essentially the conduct of trials and the control of the introduction of evidence, I believe this court is free to establish its own procedural principles.

fore, that this court is free to prescribe the use of the two-stage procedure as the one best fitted to effectuate the purpose of Congress in this statute to secure the interests of the accused and the public alike; and I would have made that procedure available to these appellants.

I am authorized to say that Chief Judge Bazelon and Circuit Judge Wright join in so much of the foregoing opinion as is addressed to the matter of the two-step procedure.

WRIGHT, Circuit Judge (dissenting in part and concurring in part):

At the close of all the evidence, counsel representing the appellants moved for a judgment of acquittal as to first degree murder on the ground there was insufficient proof of premeditation and deliberation.[1] I think the motion should have been granted and the case submitted to the jury on the lesser included offenses of second degree murder and manslaughter.

**I**

"Premeditation and deliberation" were introduced into the law of homicide as a result of eighteenth century opposition to the widespread use of capital punishment.[2] At common law there were no degrees of murder, and all murders were punishable by death. In 1794, the Pennsylvania Assembly, desiring to make punishments less "sanguinary," [3] enacted the following statute changing the common law and establishing two classes of murders:

"WHEREAS the design of punishment is to prevent the commission of crimes, and to repair the injury that hath been done thereby to soci-

ety or the individual, and it hath been found by experience, that these objects are better obtained by moderate but certain penalties, than by severe and excessive punishments: And whereas it is the duty of every government to endeavour to reform, rather than exterminate offenders, and the punishment of death ought never to be inflicted, where it is not absolutely necessary to the public safety: Therefore,

"Sect. I. Be it enacted by the SENATE and HOUSE OF REPRESENTATIVES of the commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That no crime whatsoever hereafter committed (except murder of the first degree) shall be punished with death in the state of Pennsylvania.

"Sect. II. And whereas the several offences, which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness that it is unjust to involve them in the same punishment: *Be it further enacted by the Authority aforesaid*, That all murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing * * * shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree; * * *." [4]

Other states [5] and the District of Columbia,[6] following the lead of Pennsylvania, have established two degrees of murder, using the same words, "deliberate and

---

1. The indictment under which appellants were tried was in three counts. It charged felony murder, robbery, and premeditated murder. Appellants were acquitted of felony murder.

2. Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder*, 97 U.PA.L.REV. 759 (1949); Wechsler & Michael, *A Rationale of the Law of Homicide: I*, 37 COLUM.L.REV. 701, 703–704 (1937).

3. TYSON, ESSAY ON THE PENAL LAW OF PENNSYLVANIA 18 (1827).

4. 4 JOURNAL OF THE SENATE 242 (Pa. 1794), quoted in Keedy, *op.cit. supra* Note 2 at 772–773.

5. *E.g.*, MD.CODE ANN. Art. 27, § 407 (1957); VA.CODE § 18.1–21 (Supp. 1964).

6. 22 D.C.CODE § 2401 (1961).

premeditated," to distinguish between them.

The language of the Pennsylvania statute, and the history surrounding its enactment, leave no doubt that deliberation and premeditation are basic elements of murder in the first degree.[7] The dreaded punishment of death is imposed only for those murders which are premeditated and deliberate, such as those "perpetrated by means of poison, or by lying in wait."[8] As this court has held, the required deliberation involves, at least, a process of thought which is carried on some appreciable time before the killing.[9] To require less is to obliterate the distinction between first and second degree murder and thus to frustrate the sole purpose of the statute.[10]

The Government's evidence shows that the appellants arrived at their victim's home unarmed. Compared with their victim, they were men of slight stature. They were admitted after knocking. Subsequently a fight developed in which the victim was killed by being struck on the head with part of a wooden table top, the table presumably having been broken in the fight. Appellants were apparently unaware the victim was dead.[11] However, they took his wallet and left his apartment.

If this were all the evidence, it would not seriously be argued that a sufficient showing of premeditation and deliberation had been made to take the case to the jury on the first degree murder charge. Therefore the Government relies

---

7. See Keedy, *op.cit. supra* Note 2 at 771.

8. See *Comment*, 19 So.CAL.L.REV. 417 (1946). Many jurisdictions expressly include an element of "cool state of blood" or calmness in the concept of deliberation. People v. Thomas, 25 Cal.2d 880, 156 P.2d 7, 17 (1945) ("determined upon as a result of careful thought * * * carried on coolly and steadily * * *"); State v. Faust, 254 N.C. 101, 118 S.E.2d 769, 772, 96 A.L.R.2d 1422 (1961); State v. Cade, 326 Mo. 1132, 34 S.W.2d 82, 83 (1930); Hamblin v. State, 81 Neb. 148, 115 N.W. 850, 854 (1908).

9. As to the element of time, this court held in Bullock v. United States, 74 App.D.C. 220, 220–221, 122 F.2d 213, 213–214 (1941):

"* * * To speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, is a contradiction in terms. It deprives the statutory requirement of all meaning and destroys the statutory distinction between first and second degree murder. At common law there were no degrees of murder. If the accused had no overwhelming provocation to kill, he was equally guilty whether he carried out his murderous intent at once or after mature reflection. Statutes like ours, which distinguish deliberate and premeditated murder from other murder, reflect a belief that one who meditates an intent to kill and then deliberately executes it is more dangerous, more culpable or less capable of reformation than one who kills on sud-

den impulse; or that the prospect of the death penalty is more likely to deter men from deliberate than from impulsive murder. * * *"

Prior to *Bullock*, a dictum in Bostic v. United States, 68 App.D.C. 167, 170, 94 F.2d 636, 639 (1937), cert. denied, 303 U.S. 635, 58 S.Ct. 523, 82 L.Ed. 1095 (1938), had said that "this does not require the lapse of days or hours, or even minutes." However, the phrase "or even minutes" cannot be taken as part of the holding in *Bostic*, for the facts in that case involved a deliberation of at least several minutes. *Ibid.* While it is true that the necessary deliberation requires no specific lapse of time, it is difficult to imagine how sufficient deliberation could be present without the lapse of "even minutes." See Tucker v. United States, 115 U.S.App.D.C. 250, 318 F.2d 221 (1963).

10. Wechsler & Michael, *op.cit. supra* Note 2 at 707–709. See Cardozo, *What Medicine Can Do For Law* (1928), in HALL, SELECTED WRITINGS OF BENJAMIN NATHAN CARDOZO 383–384 (1947).

11. The appellants were apprehended within minutes after the killing. The Government's witness, Mrs. Elizabeth Ryder, testified that the following remarks were made while the appellants were in the patrol wagon on the way to the police station:

"Richard [Gordon] said, 'He looks like he's pretty messed up,' and Frady said, 'He looks like he's dead.' "

on several occurrences taking place some time before the killing. The appellants were seen driving slowly by the victim's house on the afternoon before the killing. About an hour before the killing, they drove by and one of them pointed out the house. One of the appellants picked up a glove before entering the victim's apartment on the night of the killing. Parts of a conversation in a restaurant were overheard shortly before the crime. The appellants were talking with George Bennett, a brother of the victim. One of the appellants was heard to ask Bennett "if he hit a man in the chest, could you break a rib and fracture or puncture a lung, could it kill a person," to which Bennett replied, "You have to hit a man pretty hard." As they were leaving the restaurant, Bennett said to the appellants, "If you do a good job you will get a bonus."

This evidence, while it may suggest a deliberate premeditated intent to enter the victim's home for an illegal purpose,[12] is too ambiguous to support a finding of an intent to kill.[13] It is consistent with either an intent to kill or an intent to injure but not kill. Thus, in logic as well as in law, it does not necessarily provide proof of the specific intent to commit premeditated murder.

Criminal convictions, particularly in capital cases, may not rest on speculation and conjecture.[14] Evidence which creates suspicion, even grave suspicion, of guilt is not sufficient to sustain a verdict of guilt.[15] This court has held that the trial judge must require acquittal when the evidence is such, as to any element of the offense charged, that a reasonable man must necessarily have a reasonable doubt.[16] Applying this standard, I do not think the evidence here was sufficient to submit the question of premeditation and deliberation to the jury. Therefore I would reverse the conviction of first degree murder.

II

These death sentences, in my judgment, may not stand for another reason. The defendants were not afforded adequate opportunity to offer evidence in mitigation.[17] The statute provides no criteria to guide the jury in making its determination between life and death. But this absence of statutory guidance does not necessarily limit the jury's punishment consideration to the facts developed in proving the defendants guilty of the crime charged.

Ordinarily, in sentencing, such information as the background of the offender, his prior criminal record, his physical and

12. The jury convicted appellants of robbery. See Note 1 *supra.*

13. An intent to inflict serious injury, unaccompanied by premeditation, is sufficient for second degree murder, but first degree murder requires, in addition to premeditation, the specific intent to kill, that is, to take life. Sabens v. United States, 40 App.D.C. 440 (1913). *Cf.* Hansborough v. United States, 113 U.S. App.D.C. 392, 308 F.2d 645 (1962).

14. Anzoategui v. United States, 118 U.S. App.D.C. 337, 335 F.2d 1000 (1964). See generally, 1 WHARTON, CRIMINAL EVIDENCE § 11 (12th ed. 1955).

15. Scott v. United States, 98 U.S.App.D.C. 105, 107, 232 F.2d 362, 364 (1956).

16. Scott v. United States, *supra* Note 15; Cooper v. United States, 94 U.S.App.D.C. 343, 218 F.2d 39 (1954); Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837,

67 S.Ct. 1511, 91 L.Ed. 1850 (1947). This is a higher standard than the "substantial evidence" test applied in civil cases. See Goldstein, *The State and the Accused: Balance of Advantage in Criminal Procedure,* 69 YALE L.J. 1149, 1152–1163 (1960).

17. It is suggested that evidence in mitigation could have been offered during the trial. However, if such evidence were admitted, the Government could then introduce evidence in aggravation which would be highly prejudicial to the appellants on the question of guilt or innocence. Thus the appellants would have to choose between risking serious prejudice to their cause on the question of guilt and not offering any evidence in mitigation for the jury to consider before passing on the sentence. The presence of this dilemma virtually eliminates the appellants' opportunity to offer such evidence.

mental health, or lack thereof, is considered in imposing a proper penalty. Rule 32 of the Federal Rules of Criminal Procedure requires a pre-sentence report containing "any prior criminal record of the defendant and such information about his characteristics, his financial condition and the circumstances affecting his behavior as may be helpful in imposing sentence." [18]  One of the purposes behind the traditional right of allocution, which has special status in capital cases,[19] is to allow the convicted criminal to make a plea for leniency before the court, or, in this case, the jury, which is about to pronounce the sentence.[20]  Modern concepts of individualized punishment stress the importance of considering, for purposes of fixing the penalty, information which is not related to the issue of guilt.[21]  Yet none of this information was available to the jury which sentenced these defendants to die.

In giving the jury discretion to fix punishment in a capital case, Congress did not, in my opinion, demonstrate a purpose to deprive the defendant of the benefit of pre-sentence information and of his traditional right of allocution. Serious questions of constitutionality under the due process clause would surely arise from any attempt, limited to capital cases, to deprive a defendant of the opportunity to inform the court or the jury with respect to its sentencing function.

These constitutional questions can be avoided by requiring that trials under 22 D.C.Code § 2044 (1961) proceed in two stages.[22]  In the first stage the jury would determine guilt or innocence.  If the defendants are found guilty of murder in the first degree, facts in mitigation or aggravation should then be presented to the same jury so that it may have a proper predicate on which to base its judgment on whether the defendants will live or die.[23]  By using this two-step procedure, the purpose of 22 D.C.Code § 2404 that the jury determine the sentence in capital cases is effectuated without frustrating the policy underlying Rule 32, namely, that the sentence in criminal cases be based on allocution and pre-sentence information, and not merely on the facts considered in determining guilt or innocence.[24]

Chief Judge Bazelon concurs in the foregoing Part II of this opinion.

### III

With respect to the inadequacy of the jury poll and the court's instruction to the jury, I concur in Judge Fahy's opinion.

WILBUR K. MILLER, Senior Circuit Judge, with whom BASTIAN, Senior Circuit Judge, and DANAHER and BURGER, Circuit Judges, join, concurring in that part of the judgment which affirms the convictions, and dissenting from that

---

18. Rule 32(c) (2), FED. R. CRIM. P.

19. Ball v. United States, 140 U.S. 118, 129, 11 S.Ct. 761, 35 L.Ed. 377 (1891).  See also Coleman v. United States, 118 U.S. App.D.C. 168, 176–179, 334 F.2d 558, 566–569 (1964) (en banc) (concurring opinion of Judges Burger and McGowan).

20. Green v. United States, 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); Couch v. United States, 98 U.S.App.D.C. 292, 295–296, 235 F.2d 519, 522–523 (1956) (en banc) (concurring opinion of Judge Fahy).

21. Williams v. People of State of New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

22. It is, of course, a well established rule of statutory construction that a statute

must be interpreted "with an eye to possible constitutional limitations so as to avoid doubts as to its validity."  Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851 (1929); United States v. Rumely, 345 U.S. 41, 45–47, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

23. See Note, 39 N. Y. U. L. REV. 50 (1964).

24. This policy is seen in the part of 22 D.C.CODE § 2404 dealing with capital cases pending at the time of its enactment, Coleman v. United States, supra Note 19, and also in the procedures provided by 18 U.S.C. § 4208(b).  See United States v. Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963).

portion which sets aside the death sentence and orders resentences of life imprisonment: To put these cases in proper focus, I summarize their origin and development. In a three-count indictment returned April 29, 1963, a grand jury in the District of Columbia accused the appellants, Joseph C. Frady and Richard A. Gordon, of (1) the premeditated murder of Thomas Bennett, (2) the murder of Bennett while perpetrating a robbery, and (3) robbery of Thomas Bennett.[1]

Upon their pleas of not guilty, appellants were tried to a jury in the District Court presided over by Judge George L. Hart, Jr. The trial began October 29, 1963, and ended on November 7, when verdicts were returned of not guilty under the count charging murder while perpetrating a robbery, but guilty under the other two counts of robbery and premeditated murder. As to the latter the trial judge had carefully instructed the jury in strict accordance with the recently enacted statute:[2] that a verdict of guilty of murder in the first degree as charged would result in the death penalty unless it included a unanimous recommendation of life imprisonment or a report of disagreement as to punishment. Having been so instructed, the jury returned a verdict under the premeditated murder count of "guilty as charged of first degree murder" without recommendation of life imprisonment or report of disagreement as to punishment. At the polling of the jury, each member said, "Guilty as charged of first degree murder."

Accordingly, on December 6, 1963, appellants were sentenced to death upon the first degree murder convictions, as required by the new statute. They were also sentenced to imprisonment from five to 15 years on the robbery convictions. These appeals followed and were heard by us sitting *en banc.*

We are unanimous in affirming the robbery convictions, so nothing more about that need be said. Eight of us are

---

1. The first two counts were based on § 22–2401, D.C.CODE (1961), which follows:

    "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401 or 22–402, rape, mayhem, robbery, or kidnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree."

    The third count was based on § 22–2901, D.C.CODE (1961), which reads:

    "Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery, and any person convicted thereof shall suffer imprisonment for not less than six months nor more than fifteen years."

2. Section 22–2404, D.C.CODE (Supp. IV, 1965), 76 STAT. 46, March 22, 1962, which is in pertinent part as follows:

    "The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury, having determined by unanimous vote the guilt of the defendant as charged, is unable to agree as to punishment it shall inform the court and the court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment.

    \* \* \* \* \*

    "In any case tried under this Act as amended where the penalty prescribed by law upon conviction of the defendant is death except in cases otherwise provided, the jury returning a verdict of guilty may by unanimous vote fix the punishment at life imprisonment; and thereupon the court shall sentence him accordingly; but if the jury shall not thus prescribe the punishment the court shall sentence the defendant to suffer death by electrocution unless the jury by its verdict indicates that it is unable to agree upon the punishment, in which case the court shall sentence the defendant to death or life imprisonment."

in favor of affirming the first degree murder convictions—all except Judge Wright, who thinks acquittal of first degree murder should have been directed. Nevertheless, I shall state the facts somewhat in detail so the motivation of the jury's verdict may be understood. And, as these are capital cases, I think it fitting and proper also to discuss appellants' arguments for reversal which are being rejected.

Between 8:30 and 9:00 o'clock in the evening of March 13, 1963, Mrs. Sophia Huth heard knocking at the front door of the attached house next door—1109 Savannah Street, S. E.—and soon thereafter heard noises therefrom as though a fight were in progress. Then, when she heard a man's voice screaming for help, she telephoned the police. A patrol wagon with two policemen aboard arrived within two or three minutes and one of the officers alighted. He saw the appellants Frady and Gordon just as they came out the front door of 1109, and heard one of them say, "The cops," as they ran away. This officer pursued them on foot and the other followed them with the wagon.

The appellants turned the corner into 11th Place and got into a car which was parked there with its motor running. A woman, afterward identified as Mrs. Elizabeth Ryder, a friend of Gordon, was already seated in the automobile. As appellants approached the waiting car, the officer pursuing on foot saw one of them throw something to the paving under an automobile just behind the one they entered. Before they could pull away, the patrol wagon arrived and blocked them. As the wagon approached, Mrs. Ryder heard one of her companions say, "They've got us." She told the jury she saw no blood on the appellants' clothing when they left the car but noticed that both were bloody when they returned. At the officer's command, the appellants and the woman got out and were taken into custody. Frady and Gordon were unarmed, but both had fresh blood on their clothing and one had a bloody face as

well. An expert testified that the blood on the appellants' clothes was of the same type as that of Thomas Bennett. The bloody boot of one of the appellants had a metal heel plate partly circular in shape.

George Wesley, one of the two officers who first arrived at the scene, testified that, after appellants were placed in the patrol wagon, he heard one of them say that "that old man back at the house was in bad shape." This was corroborated by Mrs. Ryder, who testified that, after she was placed in the patrol wagon with appellants, she heard Gordon say, "He looks like he's pretty messed up," to which Frady replied, "He looks like he's dead."

In the meantime, there had been developments at 1109 Savannah Street. Two more officers had arrived there in another police car. They had entered and found the front room in a shambles. The articles of furniture were either broken or in complete disarray and blood was spattered on the walls. The body of Thomas Bennett lay in a pool of blood on the floor near the foot of the stairs. He had been cruelly murdered. His head had been caved in by several blows from a blunt instrument and a mixture of blood and brains was coming from the wounds. Subsequent examination of the body revealed wounds or bruises partly circular, apparently inflicted by some article of that shape. On or under the body were broken pieces of a table top, one of which was later described by a police witness, during cross-examination by appellants' counsel, as the murder weapon. He had conducted a test at the morgue which showed that this particular piece of wood fitted into the wounds on Bennett's head from which he died. One of the victim's eyes had been knocked from its socket and was lying on his cheek when the officers arrived.

Some twenty minutes later, the officer who had observed one of the appellants throw something into the street just before he entered the waiting car returned to the scene and found a wallet contain-

ing $87.00 in currency and personal papers which identified it as the property of Thomas Bennett. He also found there a pair of gloves.[3]

The first reason for reversal advanced by appellants is that the court erred in denying their motion for a directed verdict of not guilty under the first count which charged premeditated murder.[4] In their brief they admit, in effect, they were in the house at 1109 Savannah Street and had a fight with Thomas Bennett, as a result of which he died. They say:

> "The fact that the defendants were in a fight with the deceased, shortly before the death of the deceased, is not seriously disputed. The killing itself was particularly violent, *but the very violence itself and an utter lack of possession of any dangerous weapon, indicate that it was an impulsive killing and not done with deliberation and premeditation.*" (Appellants' emphasis.)

I do not agree with this contention that the violence of the killing and the fact that it was done with a piece of table top instead of with a traditional dangerous weapon indicate that it was impulsively done, without premeditation. Quite to the contrary, I think the brutality of the killing tends to indicate premeditation. It was so held in Evans v. United States,[5] where the Tenth Circuit said:

> "It is further contended that the evidence did not show malice and premeditation to warrant a verdict of guilty of murder in the first degree. It is stated in Wharton on The Law of Homicide, 3rd Ed., § 96, as follows: 'If the act which produces death was attended with such circumstances as are the ordinary symptoms of a wicked, depraved, and malignant spirit, the law will imply malice without reference to what was passing in the mind of the slayer at the time of the fatal act.'

> "The fact that cruelty or brutality is manifested in the killing will raise an inference of malice. 29 C.J. 1099, § 73. The length of time of premeditation is not material, and the circumstances of the act committed by the appellant show premeditation. Suhay v. United States, 10 Cir., 95 F.2d 890. Consequently, there is no merit in this contention of appellant."

I assume the appellants mean to argue that there was not time for Thomas Bennett's assailants to premeditate murder before the fatal blows were struck. We have held that time for premeditation must be shown before a killing can be murder in the first degree. But in Bostic

---

3. Significantly, the murder weapon bore no fingerprints.

4. It is noteworthy that the defense of insanity was not interposed or even suggested by the appellants at the trial. Although it was not asked by the appellants to do so, the District Court ordered on May 3, 1963, that they be examined by the psychiatric staff of the Legal Psychiatric Services, and that a report be furnished upon their competency to stand trial and their mental responsibility for the crimes charged. In two letters filed on May 14, 1963, the Chief of the Legal Psychiatric Services informed the court that he had attempted psychiatric examinations of the appellants in the cell block of the United States Courthouse on May 13, 1963. Both appellants had refused to be examined.

Upon motion of the Government filed June 3, 1963, both appellants were committed to Saint Elizabeths Hospital for a period not to exceed 90 days. On August 22, 1963, the Superintendent of Saint Elizabeths reported that appellant Frady was competent to stand trial and that he suffered from no mental disease or defect either at that time or on or about March 13, 1963. A similar report concerning appellant Gordon was filed August 26, 1963. These findings were not challenged, and it is not argued here that the appellants should have been found not guilty by reason of insanity.

5. 122 F.2d 461, 466 (1941), cert. denied 314 U.S. 698, 62 S.Ct. 478, 86 L.Ed. 558 (1942).

v. United States [6] this court pointed out that the authorities agree that no particular length of time is necessary for deliberation; that it is not the lapse of time itself which constitutes deliberation, but the reflection in the mind of the accused concerning a design or purpose to kill; that the jury must determine from the circumstances preceding and surrounding the killing whether reflection and consideration amounting to deliberation actually occurred.

The *Bullock* case,[7] cited by the appellants, does not help them. There we adhered to the *Bostic* ruling and simply said the evidence in that case showed the design to kill was formed practically instantaneously with the act of killing and that, consequently, there was no opportunity for premeditation. We said, 74 App.D.C. at page 221, 122 F.2d at page 214:

> " * * * There is nothing deliberate or premeditated about a killing which is done within a second or two after the accused first thinks of doing it; or, as we think the evidence shows, instantaneously, as appellant, interrupted in his quarrel, turned and fired. * * * "

And in the *Bostic* case we approved the statement of the rule of those courts which hold that some appreciable time must elapse in order that reflection and consideration amounting to deliberation may occur, but we recognized "that this does not require the lapse of days or hours, or even minutes."

The *Bostic* ruling requires us to determine, from the circumstances preceding and surrounding the killing, whether the jury was justified in finding that it was in fact premeditated. Certainly the circumstances surrounding it show the purpose to kill was not formed instantaneously as it was in the *Bullock* case. There was a vicious assault which was prolonged sufficiently before the final blows were struck to show a deliberate and premeditated killing. For example, the fight with Thomas Bennett, in which the appellants' brief admits they were engaged, lasted for at least ten minutes, according to the testimony of the neighbor, Mrs. Huth. The physical condition of the room showed also that the encounter must have continued at least that long. It was plain from the condition of the victim's body that he had been struck a number of times in addition to the fatal blows, and that he had been stamped upon by a heavy heel with a metal plate. All this indicates clearly that there was ample time for the premeditation which the jury found preceded the killing.

There was, moreover, ample evidence in addition to that just described from which the jury could conclude, as it did, that the murder was done purposely, "of deliberate and premeditated malice." At 4:30 p. m. on the day of the crime, two women were standing at different windows in an apartment building opposite 1109 Savannah Street. They testified that they saw an old car occupied by two white persons driving slowly by. Both identified the driver of the car as the appellant Frady. Mrs. Elizabeth Ryder testified that she was in a car with Frady and Gordon which was driven along the 1100 block of Savannah Street about 7:00 p. m. on March 13, 1963. She heard one appellant say "something about that is the house over there" and both appellants looked toward the south side of the street where the victim's house was located. From the testimony of these three witnesses, the jury could have concluded that Frady and Gordon twice reconnoitered so they would know Bennett's house when they returned later in the evening after darkness had completely fallen.

There was still further reason for the jury's conclusion of premeditation in Mrs. Ryder's testimony of the events which occurred after her first drive with Frady and Gordon along the 1100 block of Savannah Street. She and the appellants

6. 68 App.D.C. 167, 94 F.2d 636 (1937), cert. denied 303 U.S. 635, 58 S.Ct. 523, 82 L.Ed. 1095 (1938).

7. Bullock v. United States, 74 App.D.C. 220, 122 F.2d 213 (1941).

proceeded to a restaurant at 19th Street and Pennsylvania Avenue, N. W., where Gordon's sister, Grace Bennett, was employed as a waitress. Grace's husband, George Bennett, a brother of the murder victim, joined appellants and Mrs. Ryder at the restaurant. The latter testified that she heard George Bennett tell appellant Frady that "he needed time to get the furniture and things settled." She heard Frady ask Bennett "if he hit a man in the chest, could you break a rib and fracture or puncture a lung, could it kill a person," to which George Bennett replied, "You have to hit a man pretty hard." Just before appellants and Mrs. Ryder left the restaurant, she heard George Bennett say to her companions, "If you do a good job you will get a bonus." From this testimony, which was undenied, the jury could well have concluded that Frady and Gordon were assassins hired by George Bennett to do away with his brother in order to get his furniture and other possessions.

Mrs. Ryder was with the appellants when they left the restaurant and drove to 11th Place where they parked and got out of the car, leaving the motor running. She testified as follows:

"A They started to leave the car and I asked where they were going and they said just around the corner.[8]

"Q All right. And did the defendants get out of the car at this time?

"A Yes.

"Q And did you see the defendant Gordon do anything prior to getting out?

"A He reached down beside him and picked up an object.

"Q And can you describe what the object was?

"A I don't know exactly what they were. It looked like a cuff of a glove or heavy material of some kind."[9]

From the foregoing, I conclude the jury was amply justified in finding that the appellants were guilty of deliberate premeditated murder.

It is further contended by the appellants that the bloody clothing and boot were inadmissible because the articles were taken from them as a result of what they assert was an unlawful arrest; that is to say, they claim that the officers did not have probable cause to take them into custody just after they entered the parked car on 11th Place.

These officers had responded to a reported call for help from the premises where a fight had been in progress. They saw the appellants leave those premises, heard one of them say, "The cops," as they ran away, and then pursued and saw them get into a car which awaited them with its motor running. To say that in such circumstances there is no reasonable basis for an arrest without a warrant is to be unrealistic in the extreme; it is indeed a frivolous contention. There was no time to ask a magistrate for a warrant; the fleeing criminals were about to escape in an automobile. The officers would have been remiss in their duty had they failed to detain the appellants on that occasion merely because they had not seen the assault upon the victim and did not then know that murder had just been done.

Appellants also argue that the trial court erred in rejecting their offer to prove that Thomas Bennett, who lived alone at 1109 Savannah Street, had been unemployed for ten years but during that time had accumulated over $12,000 in bank accounts; and that, some two months after the murder, a private detective employed by their attorney, had discovered in Bennett's house a large amount of drugs known as "goof balls," hypnotics principally used to relieve the pain of withdrawal from narcotics, 5,000

---

8. The home of Thomas Bennett, 1109 Savannah Street, was "just around the corner" from their parking spot on 11th Place.

9. Cf. footnote 3, page 101, *supra*.

empty gelatin capsules, and a quantity of the utensils used by drug addicts.

In support of their contention that such evidence was relevant, the appellants say:

"* * * The purpose of this evidence was two-fold, first, to refute the character evidence adduced by the prosecution at the beginning of the case and to lay a predicate in the evidence to argue that Bennett was not the quiet, peace loving, law abiding citizen brutally attacked in his home, as the government argued in its rebuttal; and as evidence that this character of a man, in toto, was not un-aggressive. * * *"

They had previously said in their brief, "[T]he evidence of the character of the deceased for violence, vel non, was adduced by the prosecution during the testimony of Dr. McCawley, its first witness."

I observe, however, that the Government used Dr. McCawley merely to identify the body in the morgue as that of Thomas Bennett. By asking him about several other matters, including Bennett's bizarre behavior at his mother's funeral and his history of some mental disturbance—far beyond the scope of the Government's direct examination,—the appellants' attorney made Dr. McCawley his witness, as the trial judge suggested.[10] Government counsel, as he had a right to do, then cross-examined Dr. McCawley as to the matters concerning which appellants' attorney had made him his own witness. During that cross-examination, Dr. McCawley said he had never known Thomas Bennett to be violent. Thus it was a statement by the

appellants' witness that they sought to contradict by the proffered testimony that, although he had not worked for ten years, Bennett had accumulated a substantial sum of money during that time, and that two months after his murder his house contained paraphernalia used in preparing and administering narcotics.

I think the trial judge properly excluded such testimony. If believed, it may have tended to show Bennett was engaged in the illicit drug traffic, but that would have had no relevance: it would not have in any degree justified a murderous assault upon him. Moreover, the admission of evidence that Thomas Bennett had a large sum of money on deposit might well have been prejudicial to the appellants, for it might have been an additional reason, in the eyes of the jurors, for George Bennett to engage the appellants to eliminate his bachelor brother Thomas.

It is indicated in the brief for appellants that they wished to show Thomas Bennett was a quarrelsome and violent man, on the idea it would support a theory of self-defense on their part. They went to his house unarmed, says their brief, and knocked before entering. But there was no suggestion or hint of self-defense at the trial: there was nothing to indicate that, after entering Bennett's house, either appellant had reason to believe or did believe that he was in imminent danger of loss of life or great bodily harm at the hands of Bennett. In contrast to the condition of the murdered man, it does not appear that the appellants sustained any injury in the struggle, except that Gordon had a cut on his forehead.

---

10. What is known as the federal or American rule, which restricts cross-examination to matters within the scope of the direct examination, prevails in this jurisdiction. In Radio Cab v. Houser, 76 U.S.App.D.C. 35, 128 F.2d 604 (1942), our then Chief Justice, D. Lawrence Groner, noted the general rule that a party has no right to cross-examine a witness as to facts and circumstances disconnected with the matters stated in his direct examination. See also Dixon v. United States, 112 U.S.App.D.C. 366, 303 F.2d 226 (1962).

If the cross-examination goes into matters entirely beyond the scope of the direct examination, the cross-examiner makes the witness his own witness as to such matters and the evidence so elicited should be considered as the affirmative evidence of the cross-examiner.

The suggestion is made for the first time on appeal that Bennett may have been the aggressor in the fight with the appellants, and that therefore they acted in self-defense when they battered him to death. It has already been pointed out, however, that there were circumstances before and during the killing which at least justified, if they did not require, the inference that their attack on Bennett was premeditated. That being so, they are in no position now to assert self-defense even if they had proved they were reasonably fearful that their lives were in danger or that they might suffer great bodily harm. Long ago this court had occasion to say that a defendant who commits a premeditated assault upon his victim cannot claim that he killed in self-defense. This statement is found in Hopkins v. United States, 4 App.D.C. 430, 443 (1894):

> "It is laid down in textbooks of high authority, and also in decided cases, that if it appears that the conflict was in any way premeditated by the defendant, the defense [self-defense] can no longer be set up. And it must be proven that the assault upon the defendant was imminently perilous. The defendant must show clearly that he was attacked, and that he had good reason to believe that he was in imminent peril of his life or of great bodily harm. * * *"

This rule that a defendant who commits a premeditated assault upon another may not claim self-defense is subject to an exception, as pointed out by Mr. Justice Harlan in Rowe v. United States.[11]

> "* * * In Parker v. State, 88 Ala. 4, 6, 7, 7 South. 98, 99, the court, after adverting to the general rule that the aggressor cannot be heard to urge in his justification a necessity for the killing which was produced by his own wrongful act, said: 'This rule, however, is not of absolute and universal application. An exception to it exists in cases where, although the defendant originally provoked the conflict, he withdraws from it in good faith, and clearly announces his desire for peace. If he be pursued after this, his right of self-defence, though once lost, revives. "Of course," says Mr. Wharton, in referring to this modification of the rule, "there must be a real and *bona fide* surrender and withdrawal on his part; for, if there be not, then he will continue to be regarded as the aggressor." 1 Whart.Cr.Law, (9th Ed.) § 486. The meaning of the principle is that the law will always leave the original aggressor an opportunity to repent before he takes the life of his adversary. Bish.Cr.Law (7th Ed.) § 871.' Recognizing this exception to be a just one, the court properly said, in addition: 'Due caution must be observed by courts and juries in its application, as it involves a principle which is very liable to abuse. The question of the good or bad faith of the retreating party is of the utmost importance, and should generally be submitted to the jury in connection with the fact of retreat itself, especially where there is any room for conflicting inferences on this point from the evidence.' Both parties to a mutual combat are wrong-doers, and the law of self-defence cannot be invoked by either, so long as he continues in the combat. * * *"

The exception has no application here, for there is nothing in the evidence to indicate that the appellants, if they committed a premeditated assault upon Thomas Bennett as the jury found, ever retreated or in any way indicated they had abandoned their deliberate purpose and were thereafter attacked by Bennett, so that they feared he might take their lives or do them enormous bodily harm.

Another argument presented by appellants is that the District Court failed adequately to instruct on the issue of

11. 164 U.S. 546, 556, 17 S.Ct. 172, 174, 41 L.Ed. 547 (1896).

circumstantial evidence. They say the following instruction, approved in Carter v. United States,[12] should have been given:

"If you find that these inconsistent theories [a hypothesis consistent with guilt and a hypothesis consistent with innocence] are in balance, you must acquit, because to establish guilt, any reasonable hypothesis of innocence must be excluded by the evidence."

It is noted, however, that the *Carter* opinion merely approved this language in the trial judge's charge, and did not say it must be used. In Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954), in upholding the trial court's refusal to instruct that "where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt," the Supreme Court said:

"* * * There is some support for this type of instruction in the lower court decisions [cases cited], but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect [cases and other authorities cited]."

The *Carter* court, writing in 1957, of course was familiar with the Supreme Court's *Holland* case of 1954. So, it must be concluded that in the *Carter* case the court considered that the jury had not been otherwise properly instructed on the standard for reasonable doubt, and that therefore the additional instruction on circumstantial evidence was necessary.

In the later case of Hunt v. United States,[13] we said:

"* * * The ultimate test for the jury in a criminal case, however, is whether the defendant has been proved guilty beyond a reasonable doubt. This applies whether the evidence relied on for conviction is direct or circumstantial, or both. * * *"

Following what the Supreme Court said is "the better rule," we held that "where the jury is properly instructed otherwise on the standard for reasonable doubt, a charge in the language of Carter is not required." In the present case, the trial judge's charge on reasonable doubt is not attacked, and I observe that it was thoroughly accurate and adequate in setting forth the governing standards. That being so, the court is required by the *Holland* case to hold that the circumstantial evidence instruction the appellants say should have been given would have been confusing and incorrect.

Appellants' contention that Mrs. Ryder should not have been allowed to refresh her memory by referring to her written statement is so insubstantial that it is not necessary to discuss it. And their further contention that the evidence of robbery was insufficient to sustain a conviction under that count is patently frivolous. The taking of Bennett's wallet was robbery whether it was taken before or after he was murdered.[14] Anyway, appellants' complaint of their conviction of robbery is moot in view of the fact that their conviction under the premeditated murder count, which carries with it a greater penalty, is being upheld.

Complaint is made that the trial judge excessively examined a defense witness, to the prejudice of appellants. I think

---

12. 102 U.S.App.D.C. 227, 252 F.2d 608 (1957).

13. 115 U.S.App.D.C. 1, 3, 316 F.2d 652, 654 (1963).

14. Carey v. United States, 111 U.S.App. D.C. 300, 304, 296 F.2d 422, 426 (1961). The trial judge's charge correctly made

it clear, however, that the count charging murder during the perpetration of robbery could not be sustained unless Bennett was alive when his wallet was taken. Doubtless the jury found the appellants not guilty under that count because the evidence did not show whether the robbery took place before or after death.

the criticized questions were proper; but, whether so or not, they were all asked out of the presence of the jury and could not possibly have influenced that body.

Such is the situation with respect to which the order set forth above is being entered by the court—an order in which I concur in part and from which I dissent in part. It begins thus:

> "The judgments of conviction of first degree murder and of robbery are affirmed."

With this much of the order I fully agree, for the reasons given in the preceding portion of this opinion. It reflects the view of all of us except Judge Wright, who dissents from the affirmance of the first degree murder convictions.

There the substantial unanimity of the court ends. The next decisional sentence in the order, entered by the majority composed of Judges Bazelon, Fahy, Washington, Wright and McGowan, is the occasion for this dissent. It reads as follows:

> "The death sentences are set aside with directions that each appellant be resentenced to life imprisonment on the verdicts of guilty of first degree murder."

As far as I know, there is no justification in statute or case law for such action; and the crime which the appellants in effect admit they committed [15] was so unspeakably horrible that commutation of the death sentences would not be warranted even if this court had the pardoning power which it is exercising here.

The opinions of Judges Fahy, Wright and McGowan are all minority opinions; there is no majority opinion, except as to the affirmance of the convictions of first degree murder and robbery. That is to say, Judges Bazelon, Fahy, Washington, Wright and McGowan, who make up the majority which are setting aside the death sentences and remanding for resentence to life imprisonment, have not been able to agree on any one of the three opinions written in attempted justification of their action. It is interesting to note that none of the reasons given by those three opinions in support of the majority action was argued or even suggested by the appellants.

Nevertheless, I shall discuss those three opinions, beginning with those of Judges Wright and McGowan. They advance the theory that, because of the 1962 statute,[16] a trial for first degree murder should proceed in two distinct stages. They say the jury should first determine guilt or innocence, on the evidence adduced; then, if guilt be determined, a second stage should be held at which the defendant will be allowed to show facts in mitigation for the jury's consideration in fixing the penalty.

Although there is no such provision in the statute, my colleagues and the minorities who join them would legislate to that effect. Moreover, they would make their novel theory retroactive by applying it in these cases, thus partially nullifying the jury's verdict because a two-stage trial—which was not then or now required—was not held. Having reached this conclusion, I am sure my colleagues were in a quandary as to what to do in these cases, for the jury had long since been discharged and there was no possibility of a remand for the second stage hearing. They might have analogized these cases to those tried prior to the effective date of the 1962 Act for which that statute makes special provision; [17]

---

15. The appellants say in their brief, "The fact that the defendants were in a fight with the deceased, shortly before the death of the deceased, is not seriously disputed." They also state that "The killing itself was particularly violent * * *."

16. See footnote 2.

17. Section 22-2404, D.C.CODE (Supp. IV 1965), includes the following:
"Cases tried prior to March 22, 1962, and which are before the court for the purpose of sentence or resentence shall be governed by the provisions of law in effect prior to March 22, 1962: *Provided*, That the judge may, in his sole discretion, consider circumstances

that would have involved only slight additional judicial legislation. Instead, they chose to assume that a second stage, had it been held, would have revealed mitigating facts justifying a penalty of life imprisonment. One who has read the transcript of evidence in these cases, which I have summarized above, would have great difficulty in envisaging any mitigating facts which could have been presented.

After stating his personal preference for the two-step trial of first degree cases, Judge McGowan frankly says:

"The problem for me, therefore, is not one of the merits of the two-step procedure, but whether it may appropriately be adhered to by this court *in the absence of explicit legislative provision for it.* * * *"
(Emphasis added.)

Judge McGowan believes, however,

" * * * that, although Congress did not provide in terms for the two-step procedure in 22 D.C.Code § 2404, neither can it be said to have set its face against the employment of that procedure in implementation of this statute."

Thus he admits there is no legislative authority for requiring the two-stage trial of a first degree case, and says he is "implementing" the statute in adding to its terms a new provision. The Congress which enacted § 22–2404, D.C.CODE, knew perfectly well how to provide for a two-stage trial, as will be seen from the portion of that statute reproduced in footnote 17. The fact that it did not do so indicates to me that it had "set its face against the employment of that procedure."

The provisions of the Federal Rules of Criminal Procedure having to do with presentence investigation (Rule 32(c) (1) and (2)) cannot be used in support of the two-stage murder trial, as one of the opinions attempts to do, because the

presentence report is not mandatory. Rule 32(c) (1) provides that

" * * * The probation service of the court shall make a presentence investigation and report to the court before the imposition of sentence or the granting of probation *unless the court otherwise directs.* * * *"
(Emphasis added.)

The authorities are unanimous in holding that the presentence investigation is not mandatorily required. See, for example, the following cases: United States v. Karavias, 170 F.2d 968 (7th Cir. 1948); United States v. Schwenke, 221 F.2d 356 (2nd Cir. 1955); United States v. Williams, 254 F.2d 253 (3rd Cir. 1958); United States v. Visconti, 261 F.2d 215 (2nd Cir. 1958), cert. denied 359 U.S. 954, 79 S.Ct. 743, 3 L.Ed.2d 762 (1959); Roddy v. United States, 296 F.2d 9 (10th Cir. 1961).

I shall not further discuss the theory that a two-stage trial in a first degree murder case should be required for the reason that Judge Burger has ably and adequately dealt with the subject in his separate opinion, with which I fully concur.

Judge Fahy's minority opinion advances two other reasons to justify the majority's unusual action in these cases: (a) that there was error in the instruction as to penalty; and (b) that the poll of the jury did not show unanimity as to punishment. Despite the fact that neither of these propositions was accepted by a majority of the court, I think it proper to discuss them.

As to alleged error in the instructions as to penalty, little need be said. The instructions as a whole clearly and correctly told the jury how the problem of punishment should be handled by it, and it is difficult to suppose that any juror could have had the slightest doubt that, if he wanted to, he could cause disagreement as to punishment which must be

in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of life imprisonment, in which event he

shall sentence the defendant to life imprisonment. Such a sentence of life imprisonment shall be in accordance with the provisions of this Act."

reported to the court. It is, of course, elementary that a court's instructions are to be considered as a whole, and that no portion should be singled out and condemned as erroneous when the whole charge is clearly correct.

I turn next to the theory that in the poll of the jury it was error not to ask each juror if he agreed to the death penalty. The theory assumes that some juror may have supposed that the question asked in the polling process was only as to whether he agreed to the verdict of guilty of first degree murder, without ·reference to the punishment therefor; that he may not have understood that he was also being asked whether he agreed to the imposition of the death penalty.

I do not believe the jurors could have failed to understand the carefully phrased language of the judge's charge concerning the punishment for first degree murder, the jury's duty and responsibility with respect thereto, and the meaning of an unqualified verdict of guilty. I quote from the charge:

"Now, as to punishment: In the event that you find the defendants guilty of first-degree murder either under Count 1 or Count 2, it then becomes your duty to deliberate on the punishment which will be imposed. The Statute in the District of Columbia regarding punishment for first-degree murder reads as follows:

" 'The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment, or, if the jury is unable to agree as to the punishment, it shall inform the Court and the Court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment.'

"Under this law, if you return a verdict of guilty of murder in the first degree and do not add any recommendation to your verdict or do not say that you are unable to agree on the penalty, the defendants' sentences must be death.

"Similarly, if by a unanimous vote you recommend a sentence of life imprisonment, this·will be the sentence the defendants would receive. If you are unable to unanimously agree on recommending life imprisonment, then you must so inform the Court. It would then become the duty of the Court to impose sentence, either death or life imprisonment.

"It is your duty to return a verdict in this case, and I charge you that you should deliberate fully and completely in regard to the punishment. You must each reach an individual decision in this regard. This decision includes the alternatives, death by electrocution or life imprisonment.

"This is the law but as the law also requires that your verdict be unanimous, it further provides that when unanimity cannot be reached as to punishment, that is when all your individual views add up to less than a unanimous decision, then only in such event, the duty of fixing sentence falls upon the Court.

"In summary, if you find the defendants guilty of first degree murder in either the first or second count, you may return a verdict of guilty as charged which will require the imposition of the death penalty or guilty as charged with recommendation of life imprisonment; and if you are unable to agree or reach a unanimous decision as to either of these, it will then be your duty to inform the Court."

In addition to this, the judge handed to each juror a document containing with respect to each count a description of the possible verdicts, with explanatory notes. As to the first count of first degree murder (that under which the appellants

were found guilty), the document read as follows:

"FIRST COUNT          VERDICT ......
"First Degree Murder    ..............
    (Possible Verdicts:

1. Not Guilty.
2. Guilty as charged of First Degree Murder.
3. Guilty as charged of First Degree Murder with recommendation of Life Imprisonment.
4. Guilty as charged of First Degree Murder with the jury unable to agree as to punishment.
5. Guilty of Murder in the 2nd Degree.
6. Guilty of Manslaughter.

"(NOTE: If the Jury returns a verdict of Guilty as charged of First Degree Murder (being No. 2), and makes no recommendation as to Life Imprisonment and does not state that the Jury is unable to agree as to punishment, the Court *must*, under the Law, sentence the defendant to death by electrocution.

"If the Jury returns a verdict of Guilty as charged of First Degree Murder with recommendation of Life Imprisonment (being No. 3), the Court *must* sentence the defendant to Life Imprisonment.

"If the Jury returns a verdict of guilty as charged of First Degree Murder with the Jury unable to agree as to punishment (being No. 4), the Court will thereupon have the duty to fix the penalty and will impose either a sentence of death by electrocution or a sentence of life imprisonment at the *discretion of the Court.*" (The emphasis in this Note is that of the trial judge.)

The judge further explained the form by saying:

"If, however, the jury has found the defendant not guilty under the second count [felony murder], they will then consider all possible verdicts under the first [premeditated first degree murder], being any one of numbers 1 through 6; * * *

"And then below are further instructions, as I have previously given, about the penalties, so they will be perfectly clear to you."

Then the judge added this significant comment:

"Now, the members of the jury who are not the foreman or the forewoman may make a note on their copies of these so that if you should be polled after your verdict is in by either side, you will have a ready reference to what your verdict is."

The foreman wrote into the blank after the word "verdict" on ·the first count form the words "Guilty as charged of First Degree Murder" and signed the document. When the jury was polled, each juror was asked, "What say you as to the defendant on Count 1?" and each answered in the exact language of the verdict signed by the foremen, "Guilty as charged of first degree murder." It will be observed·that this was the second of the six possible verdicts shown on the form furnished to each individual juror

Thus, each juror expressly rejected during the polling process possible verdicts Nos. 3 and 4 which read respectively, "Guilty as charged of First Degree Murder with recommendation of Life Imprisonment" and "Guilty as charged of First Degree Murder with the jury unable to agree as to punishment."

All this demonstrates beyond peradventure, I think, that each juror consciously and intelligently stated that he agreed to the verdicts which found the defendants guilty and imposed the death penalty. I see no reason whatever for asking them any other questions, when the judge had so carefully explained to them that the verdicts which they finally chose to find would mandatorily require him to sentence the defendants to death by electrocution.

The strained and ineffectual attempts of three judges to justify the extraordinary action of the majority in these cases leads me to conclude that the real reason for it is an ingrained personal antipathy to capital punishment on the part of the

judges who constitute the majority, even though they may not be aware of that motivation. I do not mean to impugn the good faith of my colleagues. I simply say that, in their zeal to save these merciless mercenary murderers from the doom pronounced by the jury, they have deluded themselves into actually thinking there is validity in the unsound doctrines they announce.

This reaction to the death penalty on the part of an appellate court is not unusual, says John D. Pomfret in an article entitled "Law: Death Penalty" in The New York Times of February 28, 1965, which included the following:

"* * * Society has a bad conscience about putting criminals to death, and appellate courts sometimes set tortured precedents in contriving ways to set aside death sentences which seem to them shocking or unfair."

It seems to me that Mr. Pomfret's observation showed prescience of the majority's action here.

Some of us who are dissenting share with the majority the view that capital punishment should be abolished. But we must all realize that it is our judicial duty to uphold the law as it is written, regardless of our personal dislike or disapproval of it. Quite recently, the Congress refused to abolish capital punishment in the District of Columbia, although it had been importuned to do so by many persons and organizations. Instead, Congress provided in the 1962 Act that in this jurisdiction death shall be the punishment for murder in the first degree—which includes premeditated murder—unless the jury unanimously recommends life imprisonment or reports it is unable to agree as to the penalty. In these cases, as I have said, the jury made no such recommendation and did not report disagreement as to the punishment; hence the sentences pronounced by the District Court were required by the statute.

The court cannot set aside the verdict of the jury unless the evidence was insufficient to sustain it or unless prejudicial error occurred during the progress of the trial. From what has been said, it is apparent that the evidence amply supported the verdict; and there is no prejudicial error in the record. The able District Judge conducted the trial in exemplary fashion, and charged the jury in a manner which was beyond criticism. The appellants had no real defense and there is no real reason shown on appeal why they should not pay that penalty for their atrocious crime which the law provides and the jury imposed.

BURGER, Circuit Judge (concurring in part and dissenting in part):

I join in Judge Miller's opinion which concurs in the affirmance of the convictions appealed from but dissents as to the disposition of the issue of sentence. In common with most, if not all, members of the court, I have grave reservations concerning capital punishment; but we are here to uphold the law, not to engage in sophisticated nitpicking in order to implement our disagreement with the decision Congress has made on capital punishment. Nor is it our function, as a majority of the court has blandly done—for varying reasons—to take over the President's powers of executive clemency.

I

The principal opinion—for as Judge Miller has stated there is no majority opinion—quarrels with the District Court's scrupulously fair and correct charge to the jury relating to the necessity for a unanimous verdict. Judge Fahy quotes but one part of the charge, and if that had been all the jury was told there would be a plausible basis for his conclusion. But it is not the whole story; elsewhere the District Judge had dealt explicitly with the punishment aspect, reading the first degree murder statute to the jurors including the direction to inform the court of lack of agreement on punishment. Then the Judge charged the jury as follows:

*"Under this law, if you return a verdict of guilty * * * and do*

*not add any recommendation to your verdict or do not say that you are unable to agree on the penalty, the defendants' sentences must be death.*

"Similarly if by a unanimous vote you recommend a sentence of life imprisonment, this will be the sentence the defendants would receive. *If you are unable to unanimously agree on recommending life imprisonment, then you must so inform the Court. It would then become the duty of the Court to impose sentence, either death or life imprisonment.*

"It is your duty to return a verdict in this case, and I charge you that you should deliberate fully and completely in regard to punishment. *You must each reach an individual decision in this regard.* This decision includes the alternatives, death by electrocution or life imprisonment.

" * * * *[W]hen all your individual views add up to less than a unanimous decision,* then only in such event, *the duty of fixing sentence falls upon the Court.*

"In summary, if you find the defendants guilty of first degree murder in either the first or second count, you may return a verdict of *guilty as charged which will require the imposition of the death penalty or guilty as charged with recommendation of life imprisonment; and if you are unable to agree or reach a unanimous decision as to either of these, it will then be your duty to so inform the Court.*"

(Emphasis added.) The passage just quoted was prefaced by the following remark, which preceded the reading of the statute itself to the jury: "Now, as to punishment: In the event that you find the defendants guilty of first-degree murder either under Count 1 or Count 2, it *then* becomes your duty to deliberate on the punishment which will be imposed." (Emphasis added.)

I suggest that this preface and the charge itself clearly separate the decision on guilt from the penalty determination. And the *individual* nature of the assessment of penalty is likewise made clear: *lack* of unanimity—resulting in sentencing by the court—is put upon an equal plane with agreement on death or life. This lack of pressure for unanimity on penalty equally characterizes the portions of the court's charge which follow that portion discussed in Judge Fahy's opinion. Immediately after the passage now challenged the court carefully went over the form of verdict for the second count as an example to the jury:

"There are four possible verdicts that you may reach. * * * You can, you see, reach a verdict of not guilty, of guilty as charged to first degree murder, of guilty as charged to first degree murder with recommendation of life imprisonment, or, four, guilty as charged of first degree murder with the jury unable to agree as to the punishment.

\* \* \* \* \* \*

"If * * * the jury has found the defendant not guilty under the second count, *they will then consider all the possible verdicts* under the first count, being *any one of numbers 1 through 6;* and you will note * * * that the first four verdicts are the same as those relating to the second count. * * *"

(Emphasis added.) The court thus made clear in discussing the second count that the various verdicts were of equal weight and indicated that the same was true of the possible verdicts under the first count. In my view the court's instructions, read together with the unambiguous forms of verdict given the jurors—to which I next turn—compel the conclusion that the jury well understood the nature of its functions in deciding the separate issues of guilt and punishment.

The second and final prop used to sustain the principal opinion is the polling point, containing a sub-prop concerning the adequacy of the forms of verdict. Following the order of discussion of the principal opinion, I take up the sub-prop

first. The court finds no mention of punishment in the "body" of the form, observing with disapproval that that "vital matter" has been relegated to an "explanatory note." Without quibbling over the characterization of the list of verdicts as the "body" of the form, I simply point out that the "note" occupies more space than the "body." I am unwilling to assume that the jurors would neglect to give careful study to the extended explanatory note—and the form as a whole—when pondering on a man's life.[1] Moreover, the court *twice* called their attention to the note in explaining the form:

"Now, you will see certain notes underneath this verdict which tell you what the penalties are * * * and I won't go over those with you because I think they are perfectly plain.

\* \* \* \* \* \*

"And then below are further instructions, as I have previously given, about the penalties, so they will be perfectly clear to you."

The note could not have been more clearly drafted; to find fault with it defies common sense.

It has become fashionable of late to discount the intelligence of jurors, but I cannot bring myself to believe that these plain-spoken verdict forms could have misled the jury, guided as they were by the court's painstaking oral instructions discussed above. I cannot imagine that any juror instructed that the words "guilty as charged" *without more* meant a sentence of death could possibly suppose, as Judge Fahy argues, that a verdict of "guilty as charged" would mean something other than the death sentence. The principal opinion has no basis without an assumption that these jurors were illiterate morons.

In enacting the present amendment to D.C.Code Ann. § 22–2404 Congress rejected a draft bill submitted by the Judicial Conference of this Circuit and approved by the Judicial Conference of the United States. The first sentence of the *rejected* bill reads as follows: "The punishment of murder in the first degree shall be life imprisonment unless the jury by separate unanimous vote recommends the death penalty." Upon receipt of such a recommendation the court, under that draft bill, was to conduct a sentencing hearing after which it could overrule the jury determination of death. However, rather than accepting this bill, weighted, as it was, in favor of life imprisonment, Congress went out of its way to provide that "The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury * * * is unable to agree as to punishment it shall inform the court," which then must fix the sentence. Under this statute death is the residual punishment for first-degree murder; it must follow a verdict of guilty unless the jury affirmatively acts in the manner detailed in the statute. And a jury verdict for the death penalty may not be set aside by the trial court as was possible under the rejected Judicial Conference proposal. As a citizen I favor the bill which was rejected; as a judge I am sworn to apply the will of Congress—not my own.

## II

Since some members of the court have expressed the opinion that Appellants were entitled to a split-verdict procedure below, that subject needs comment.

No one suggests that the Constitution, statutory language or legislative history requires implementation of D.C.Code Ann. § 22–2404 with a two-trial procedure like those adopted in four states and recommended by the American Law In-

---

1. One might speculate as to the reactions of the 12 jurors in this case to what this court does today. Having been put through the agonizing ordeal of imposing the death penalty—knowing that any one of them could have blocked that result—they are now informed by four members of the court that they really did not know what they were doing.

stitute. The argument (brilliantly advanced by *amicus* counsel over the vigorous disclaimer of counsel for Appellants) is rather that the court may fashion such a scheme out of a "neutral" congressional will or out of a "silence" we envisage from failure by Congress expressly to specify that a split-verdict procedure is *not* to be judicially instituted. I cannot subscribe to this argument because the terms of the statute itself and the relevant history demonstrate that the traditional single trial was intended with the jury having a dual function—on guilt and on penalty.[2]

Whatever else it knew or intended, Congress certainly must have been aware that it was drafting a statute for a jurisdiction which, like the overwhelming majority of the states, had no experience with anything but a "one-trial" system in criminal jury cases. And yet we are asked to believe that Congress' *silence* concerning this subject amounts to a license to judges to change this long-established way of life at our convenience. I can hardly believe that Congress must, by preamble or appendix to each statute, enumerate all the alternatives it has considered and rejected in order to preclude the courts from "implementing" a statute with an alternative which the records reveal Congress found unacceptable in fact.

It is my belief that the statute's provision for three jury choices on penalty (lack of unanimity either way being one choice) was drawn to meet the problem of Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948). See H.R.Rep.No.1874, 86th Cong., 2d Sess. 1 (1960). That case held that a jury may not return a guilty verdict under 18 U.S.C. § 1111 unless they are unanimous with respect to their discretionary determination of penalty. The "problem" of the *Andres* case is of course that it encourag-

es jury nullification: one juror with scruples against capital punishment can "hang" a jury unanimously agreed on the defendant's guilt. The most obvious way to avoid this problem was to provide separate trials on guilt and penalty such as is now urged. An alternative solution was to modify the existing single-trial procedure to provide a mechanism which would save a verdict of guilty where some jurors disagreed on penalty. The latter, I submit, is what Congress has done.

It must be assumed that Congress by March 1962 was well aware of the two-trial solution; at that time the California and Pennsylvania statutes had been in effect—and the Model Penal Code provision in draft—for some time. Any doubt on this is removed when we observe that at the time Senator Keating introduced the first bill, S. 2083, on June 1, 1959, immediately after our Judicial Conference, he informed his colleagues that an alternative to his proposal of a single-trial procedure was the American Law Institute two-trial procedure. 105 Cong.Rec. 9393. Senator Keating likewise caused the Report of the District of Columbia Circuit Judicial Conference to be read into the Congressional Record. That report, later approved by the Judicial Conference of the United States, indicated that a split-verdict procedure had been considered and rejected. See 106 Cong. Rec. 6218–6219.

Congress must, then, be supposed to have known what a two-trial statute was and how it functioned generally. With this knowledge it refused to create one. Nor can it be supposed that the present statute was meant to leave in judicial limbo the question of single- versus split-verdict procedure. Congress undertook to deal with a procedural problem; it cannot be thought to have left the job half done, to be finished by this court. I submit that the only fair reading of

2. Particularly persuasive of Congress' supposition that the old "one-trial" system was to continue is the argument of Senator Hartke against a proposed amendment which would have enabled the jury to foreclose the possibility of parole.

The senator reasoned that it would be inadvisable to vest such power in the jury, since that body is foreclosed from the relevant background evidence by the traditional rules of evidence. 108 Cong. Rec. 4131.

the present legislation is that it does no more—and was intended to do no more—than modify the single-verdict procedure to meet the *Andres* problem created by the decision to make death discretionary.[3]

If it be assumed *arguendo* that the legislative history is "neutral" and that we do indeed have power, ought we adopt a two-trial system in this case as a matter of sound judicial policy?

Various arguments against such a system appear in the proceedings of the Judicial Conference of this Circuit which considered this problem in drafting the bill it sent to Congress: *e. g.*, that such a procedure would be troublesome, expensive and time-consuming; that the introduction of aggravating background evidence would work too harshly against the defendant, inflaming the jury rather than providing a basis for dispassionate exercise of discretion. A further substantial argument made against a two-trial system during the course of our 1959 Judicial Conference proceedings was that defendants are probably better off under the present system, since in many capital cases the "insanity" issue is raised and the accused reaps much of the benefit of developing background information in mitigation without the burden of being exposed to evidence in aggravation. Some serious students of this problem

see an additional point in that defense counsel may be slow to adapt their tactics to a two-trial procedure, thus prejudicing their clients.[4]

Other problems exist to which the advocates of a two-trial system have not addressed themselves: Who would prove what at the "second trial" and what would be the standard of proof? See Kuh, A Prosecutor Considers the Model Penal Code, 63 COLUM.L.REV. 608, 615 (1963) (finding the Code defective in failing to deal with standard of proof). Would the conventional rules of evidence, including the exclusionary rules, be abrogated for the second proceeding as has always been true on imposition of penalty by the "penalty-fixer" in order to permit the penalty to be determined in the light of pre-sentence reports and other sources not subject to cross-examination? See Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1948); Note, The Two-trial System in Capital Cases, 39 N.Y.U. L.REV. 50, 63–73 (1964). Given the terms of the present statute, which speaks of "the jury," could the trial judge, for good cause shown, empanel a *new* jury for the penalty trial as is possible in New York?

Under the statute Congress has given us, the jury's discretion, I take it, is to

---

3. *Amicus* argues that, since the statute contemplates that when the judge alone fixes the penalty he must hear evidence in mitigation and aggravation, Congress must have intended that juries also hear such evidence independent of the trial on the indictment. First, I submit that the normal rules of statutory construction point to the opposite conclusion. Second, is there not a rational basis for Congress to provide that a trained, professional judge can hear inflammatory evidence against the defendant which is not for the ears of impressionable laymen? Third, Congress may well have believed that when a single human being makes the fateful choice between life and death he should be safeguarded from precipitate action by the requirement that he give consideration to background evidence, whereas this is not essential when each of twelve persons has a veto against death.

4. " * * * The California experience, dating back to 1957, has * * * been that defense counsel have often neglected to prepare adequately for the penalty phase and have exhibited a lack of sophistication concerning what facts should be advanced as mitigating. * * * On the other hand, the prosecution has taken complete advantage of the penalty phase and has attempted to marshal and to present to the jury all of the aggravating circumstances that exist." Note, *Executive Clemency in Capital Cases*, 39 N.Y.U.L.REV. 136, 167 (1964). The California court has found it necessary to reverse frequently for "substantial error" in the penalty phase, as it may do under the terms of the California statute. Note, *The Two-trial System in Capital Cases*, 39 N.Y.U.L.REV. 50, 60 (1964).

be absolute. If we were to adopt a two-trial system, would there be such a thing as reversible error in the second or "penalty" trial? If so, what would be the scope of review? If error were found only in that phase, would a new *guilt* trial be necessary on remand? May the trial judge direct a verdict of life (guilt being already established) if he feels the second-trial evidence leads to only one result? Could he direct a verdict of death if the evidence were "all one way"?

If the jury's discretion at the penalty proceeding were to be absolute, it would be free to impose death without the existence of any substantial aggravating factor such as those written into the Model Penal Code. Under that Code, the jury must find at least one of the aggravating circumstances and must find further that there are no substantial mitigating circumstances. Some such rein on discretion would seem advisable. But a statute or rule drawn without such a provision could be found to grant absolute discretion to the jury. This has happened in New York and California.[5]

A legislative body drawing a two-trial statute might well want to consider adopting two interesting provisions of New York's legislation: that which requires that a defendant under 18 years of age who is found guilty must be sentenced to life imprisonment, and that which mandates that a defendant who pleads guilty with the consent of the court and the prosecutor shall automati-cally receive such a sentence. See N.Y. Penal Law, § 1045. See also Cal.Pen. Code § 190.1. I do not suppose that Judge McGowan would argue that precise provisions of this nature can be adopted by any but a legislative body. If I am wrong in this supposition and if indeed he would feel capable of formulating such rules of law, then I suggest there are virtually no limits on the kind of "statutes" we can draft to "implement" Acts of the Congress.

This enumeration of a few of the problems confronting the designers of any two-trial system should make clear the utter folly of institution of such a system except after careful study of all its ramifications. We have not made such a study and we are not equipped to do so in the resolution of an appeal. With all deference to Judge McGowan's position, I suggest that his opinion amounts to an advocate's brief which would be appropriate as a petition to Congress. His proposal is not simply a matter of "devising procedural methods" to implement a statute; he proposes a totally new statutory scheme which, as I have noted, both the Judicial Conference and the Congress considered and rejected. If a majority of the court was now prepared to adopt a two-trial or split-verdict procedure, we would swiftly discover that the "implementation" now lightly glossed over is in fact a major job of statute drafting.[6]

I am authorized to state that Judges Miller, Danaher and Bastian join in the views here expressed.

5. See *id.* at 73. In New York, however, it is possible for the trial judge to opt for life merely on the basis of the guilt trial. The judge may foreclose the penalty issue from jury consideration by decreeing life imprisonment if he finds that a "sentence of death is not warranted because of substantial mitigating circumstances," N.Y.Penal Law, § 1045(3), a procedure not permitted under the California legislation. *Quaere* whether this court or the District Court could "implement" D.C.Code Ann. § 22–2404 to conform to the New York practice, given that that section provides for death "unless the *jury* * * * recommends life * * * or * * * is unable to agree as to punishment * * *."? (Emphasis added.)

6. State v. Mount, 30 N.J. 195, 152 A.2d 343 (1959) is instructive in this regard. There the New Jersey Supreme Court found that legislative action would be necessary to institute a two-trial procedure. A concurring opinion wisely observed that "The orderly and practical administration of criminal justice requires that the problems herein be settled by comprehensive legislative and not piecemeal judicial action." *Id.* at 358. See also People v. Friend, 47 Cal.2d 749, 306 P.2d 463, 471, n. 7 (Cal.1959) (calling for legislative action—which resulted in the California statute).