Commonwealth *v.* Martin, Appellant.

Argued September 27, 1954. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Benjamin H. Marks,* with him *Hiram M. Drake,* for appellant.

*John W. McWilliams,* District Attorney, for appellee.

OPINION BY MR. JUSTICE JONES, November 23, 1954:

The defendant was indicted and tried for the felonious killing of his wife. The jury found him guilty of murder in the first degree and fixed the penalty at death. His motion for a new trial was denied. From the judgment of sentence imposed, he brings this appeal and assigns for error a number of matters, the principal ones being that the trial judge erred (1) in refusing to retire the jury for the purpose of taking testimony on a pending motion by the defendant for the withdrawal of a juror based on alleged mingling of the jury with strangers in the lobby of the hotel where the jury was housed during trial recesses, (2) in not charging the jury adequately on the law of manslaughter, (3) in not charging more fully with respect to provocation in its relation to manslaughter and (4) in refusing defendant's request to have the jury polled after their verdict had been announced. The remain-

ing assignments are either incidental to those above stated or independently fail to support a claim of reversible error.

The first assignment merits little discussion. Upon the court's refusal to retire the jury for the taking of testimony on the defendant's motion for the withdrawal of a juror, the withdrawal motion was at once abandoned by defendant's counsel so that the matter forthwith became moot and so remained thereafter. But, beyond that, as the learned trial judge cogently stated in the opinion for the court refusing the defendant's motion for a new trial,—". . . there is not a scintilla of evidence that the jurors separated, much less that they communicated with others. The Court afforded defendant an opportunity to present any evidence on the point. The Court was not informed of the source or character of the information upon which defendant's counsel chose to rely. We are convinced that defendant's counsel had no faith in their ability to prove anything savoring of a separation of the jury. We think this is confirmed by the voluntary withdrawal of the motion. . . . The fact is that the defendant never indicated any particular juror as offending. If he had, we would have arranged to interview the juror, or jurors, in chambers in the presence of defendant's counsel. . . . Notwithstanding that defendant's counsel offered nothing to support his motion we nevertheless conducted such an investigation as was possible and concluded that the complaint was wholly without substance." Plainly enough, there was no just basis for the assignment of any error in this connection.

Equally unmeritorious are the appellant's complaints with the charge of the court as to the law relating to voluntary manslaughter and also as to the part provocation may play in adjudging guilt for a

willful killing. Aside from cognate portions of the charge which were not only unexceptionable but were actually not excepted to, the learned trial judge affirmed, inter alia, three points for charge submitted by defendant's counsel relative to provocation and its relation to voluntary manslaughter. In the case of two of the three points, the court added qualifications which were both proper and pertinent. The defendant's point defining voluntary manslaughter as a killing intentionally committed under the influence of passion induced by provocation, which placed the accused beyond the control of reason, was affirmed with the qualification that there must be reasonable basis for the provocation. The other point which the court qualifiedly affirmed was drawn to instruct the jury that, if they believed the defendant with respect to the provocative circumstances to which he had testified, they could find him guilty of voluntary manslaughter. The qualification which the court properly added was that "If you do not believe there was a provocation, even in part, then you need not consider the question of voluntary manslaughter at all; that would be out of the case." See *Commonwealth v. Yeager*, 329 Pa. 81, 85-86, 196 A. 827. Both qualifications were as essential as they were pertinent.

The only testimony as to provocation came from the defendant himself. He testified that he had returned to the apartment of himself and wife about midnight after an evening of drinking. He knocked on one of the two hall-door entrances to the apartment and, receiving no response, went to the other door where he knocked with equally ineffectual result. He returned to the door where he had first knocked and knocked again. This time, the lights went on in the apartment and the door was opened by his wife who was scantily clad. He testified that, as he entered the apartment,

he saw a man leaving by the other door and, when he asked his wife who it was, she said "How do I know?" He then asked her "Why are you dressed like that?" She replied, "What do you care?" And, he answered, "I'm supposed to care, I'm your husband. If I don't care, who does?" With that, his wife "smacked [him] across [the] jaw." He reached in his pocket for his knife with which he cut her on the shoulder several times. It is presently unnecessary to relate the gruesome details, further appearing, as to the character of the fatal wounds which the defendant inflicted on his wife with such extreme violence as to leave no doubt of the malice he bore toward her. The important thing at this point is that the defendant's testimony, as above related, was directly refuted by the deceased's nine-year old daughter by a prior marriage.

The daughter, called as a witness by the Commonwealth, testified convincingly in direct examination and, in the face of a lengthy and searching cross-examination, maintained, without confusion or self-contradiction, her version of what had actually happened. According to the daughter's testimony she had been asleep in a bedroom of the apartment and, having been awakened by the defendant's knocking, *she* went to the door and admitted him. Upon entering the apartment, the defendant asked her, "Where's Sue?" referring to his wife. The daughter answered "She's in her room," meaning the bedroom. The defendant then entered the bedroom, the daughter following to the bedroom door. The wife was in bed apparently asleep. The defendant struck her several times, saying, "Sue, wake up." He continued to strike her until she began to bleed. With that, the daughter fled the apartment, running several blocks to her grandmother's. It is obvious that if the jury accepted the daughter's testimony, as they might well have done and

probably did, there was no credible evidence in the case as to any provocation of the defendant. The learned trial judge was therefore correct in appending to the requests for charge the qualifications as to provocation and manslaughter whereof the defendant now complains.

That brings us to the trial judge's denial of the defendant's request that the jury be polled. The reason given by the court for its refusal of the request was that it had come too late. However, as we view the attending circumstances, the request was still timely when made and should, therefore, have been granted. The action of the court in such regard worked a denial of a right of the accused so fundamental as to require a retrial even though, as clearly appears from the record, the trial was otherwise markedly free from error and the jury's verdict was fully warranted by the evidence. Yet, it is better that the case be tried again than that a precedent impairing a defendant's right to a poll of the jury be engrafted on our criminal procedure.

The right of a defendant to poll the jury which has returned a verdict of guilty against him has been widely recognized and accorded: 3 Wharton's Criminal Procedure (10th Ed.), §1683; 2 Bishop, New Criminal Procedure (2nd Ed.), §1003-3; Abbott, Criminal Trial Practice (4th Ed.), §735. The procedure had its genesis in ancient common law (see 2 Hale, Pleas of the Crown 299) and has long been both approved and uniform practice in this State: *Walters v. Junkins*, 16 S. & R. 414, 415; *Commonwealth v. Twitchell*, 1 Brewster 551 (O. & T. Phila. Co.); *Commonwealth v. Krause*, 8 Philadelphia 607 (Q.S.); *Commonwealth v. Buccieri*, 153 Pa. 535, 553, 26 A. 228; *Commonwealth v. Schmous*, 162 Pa. 326, 336, 29 A. 644; *Commonwealth v. Scovern*, 292 Pa. 26, 36, 140 A. 611; cf.

*Commonwealth v. Johnson,* 359 Pa. 287, 291, 59 A. 2d 128. See, also, 1 Sadler, Criminal Procedure in Pennsylvania (2nd Ed., Henry), §504, and Moschzisker, Trial by Jury, §347. Even the Commonwealth possesses the right to have the jury polled: *Commonwealth v. Lemley,* 158 Pa. Superior Ct. 125, 127, 44 A. 2d 317. It would be a work of supererogation to enter here upon a consideration of the justification for the rule which permits the polling of a jury. Suffice it to say that as early as *Walters v. Junkins,* supra, Mr. Justice ROGERS recognized for this court that "there are many cases in the books, of a jury changing their verdict, immediately after they have pronounced it in open court, and before it was received and entered (Dyer 204 *b.*; Saunders *v.* Freeman, Plowd. 209; Co. Lit. 227 *b*)." The polling of the jury is the means for definitely determining, before it is too late, whether the jury's verdict reflects the conscience of each of the jurors or whether it was brought about through the coercion or domination of one of them by some of his fellow jurors or resulted from sheer mental or physical exhaustion of a juror. Manifestly, the right is of especial importance where a verdict carrying capital punishment has been rendered. And, that is all the more so since 1925 when the duty of fixing the penalty for guilt of first degree murder between life imprisonment and death was reposed in the jury (see Act of May 14, 1925, P. L. 759, and re-enactments).

As stated in some of our cases, cit. supra, and by text writers, the procedure for polling a jury requires that the request be made before the verdict is recorded. But, the only reported case in this State that we have found where a poll of the jury in a first degree murder case was refused because the request was made too late is *Commonwealth v. Twitchell,* supra. The report of that case (1 Brewster) shows that "The jury

rendered a verdict of guilty of murder of the first degree. After the verdict was recorded the defendant moved that the jury be polled. The motion was overruled as being made too late." A subsequent motion for a new trial was likewise overruled, sentence of death was imposed and this court, under the practice then obtaining (1869), refused an allocatur. The Supreme Court of the United States, in turn, refused a writ of error. But, the rule that the poll must be asked for before the verdict is recorded has not been uniformly enforced. In *Commonwealth v. Schmous,* supra, on an appeal from a conviction of first degree murder, it was said that "According to the well settled practice in the oyer and terminer, the request to poll the jury came too late, and should have been denied. The verdict in due form had already been not only announced, but recorded and affirmatively responded to by the entire jury." However, that was a dictum. The poll, even though late, was there allowed, and this court did not reject or ignore the results of the poll but interpreted the jurors' separate answers to the clerk's interrogations to have been in actual affirmance of the verdict as theretofore announced for the jury aggregately.

Trial courts, where the "practice in the oyer and terminer" has for the most part been developed, have permitted a poll of the jury after the verdict has been recorded. In *Commonwealth v. Krause,* supra, "After verdict of guilty rendered and recorded, counsel for the prisoner moved to poll the jury, and it was objected that the motion was too late *after the verdict had been recorded.* The court, however, allowed the motion" (Emphasis supplied). In *Commonwealth v. Lutz,* 10 Kulp 231 (O. & T. Luzerne Co.), "The jury . . . brought in a verdict in writing, in which they all agreed that the defendant was guilty of murder in the first de-

gree. . . . after the written verdict had been filed, the defendant's counsel said: 'I would like to have the jury polled.' The clerk proceeded to poll the jury." After one juror had been questioned and had intimated disagreement with the verdict, the court, by leading questions, confirmed the dissident juror's agreement in the verdict as originally returned and accepted it. On motion for new trial, the court concluded that "If [the juror's] statement had been completed it would undoubtedly have been shown that he had reached a different conclusion from that which was incorporated in the written return which he had signed and which was returned by the jury." Because of the doubt in the court's mind, "as to whether that which was done at the time the verdict was returned was the verdict of the conscience of the whole jury," the court allowed the motion for a new trial. After the second trial and like conviction of murder in the first degree, the case came to this court (200 Pa. 226) on the defendant's plea of former jeopardy on the ground that the disposition made at the earlier trial was tantamount to a discharge of the jury. This court affirmed the judgment of sentence without comment on the action of the court below in granting a new trial because of the incomplete poll of the jury *after the verdict had been filed* other than to state confirmatorily that what "induced the court below to allow and make absolute the motion for another trial . . . sufficiently appears in the record and in the opinion of the court granting a new trial."

In the instant case, it is clear that the verdict had not been recorded when the request for a poll of the jury was made. The reporter's notes of the trial, as originally transcribed, show the following: "THE CLERK: Members of the jury, have you agreed upon the verdict? THE JURY: We have. THE CLERK: Who shall speak for you? THE JURY: Our foreman.

THE CLERK: What say you as to the guilt or innocence of the prisoner? Foreman reads verdict as follows: 'And now, to-wit, the 20th of September, 1952, we, the jurors empaneled in the above entitled case, find the defendant guilty of murder in the first degree, and the penalty shall be death.' MR. DRAKE [defendant's counsel]: Your Honor, we would like to have the jury polled. THE COURT: You can't do that after the verdict is taken in the case. The Court directs the Clerk to read the verdict. The Clerk reads the verdict as follows: 'Members of the jury, hearken to the verdict as the Court hath ordered it recorded. In the issue joined wherein the Commonwealth is the plaintiff and John Martin is defendant, you find the defendant guilty of murder in the first degree and that the penalty shall be death, and so say you all.' Jury assent." It is evident from the foregoing that the verdict had not yet been recorded when the request for the poll was made.

The learned trial judge, however, in the opinion for the court refusing the defendant's motion for a new trial, gave, as was his right, his version of the circumstances attending the jury's rendition of its verdict as follows: "The jury returned at 7:37 p.m. The clerk called the roll of jurors and found all to be present. The Court directed the Clerk to take the verdict. The Clerk asked the jurors whether they had agreed upon a verdict. The jurors announced, 'We have.' The Clerk then asked, 'Who will speak for you?' The jurors answered, 'Our foreman.' The foreman then arose. The Clerk then inquired, 'What say you as to the guilt or innocence of the prisoner?' The foreman orally announced, 'And now, to-wit, the 20th day of September 1952, we the jurors empaneled in the above entitled case find the defendant guilty of murder in the first degree, and that the penalty shall be death.' The

foreman resumed his seat. The clerk resumed his seat. The trial judge observing that the foreman held a slip of paper, indicated to the tipstaff that the paper should be brought to the bench. Thereupon the tipstaff went to the foreman, obtained the paper upon which the verdict was written, and brought it to the bench. The court examined the jury slip, and returned it to the tipstaff with directions to deliver it to the clerk. The tipstaff walked around the bar to the clerk's desk and delivered the verdict slip to the clerk. Thereafter the clerk arose saying, 'Members of the jury, hearken to the verdict as the Court hath ordered it recorded—' At this point counsel for defendant interrupted the clerk saying, 'We would like to have the jury polled.' The Court replied, 'You can't do that after the verdict is taken in the case.' . . . The clerk then resumed reading saying: 'In the issue joined wherein the Commonwealth is plaintiff and John Martin is defendant, you say you find the defendant guilty of murder in the first degree and that the penalty shall be death, and so say you all. The jury assented.' "

Accepting, as we do, the learned trial judge's version of the occurrence, the facts do not justify the court's inference that the verdict had been recorded at the time defendant's counsel requested a poll of the jury. It is too plain for discussion that the verdict could not have been recorded before the clerk had read it back to the jury for their *viva voce* confirmation which is ordinarily given in unison. Here, that had not been done and, until it was done without dissent from any juror, the verdict could not be considered as recorded. In *Eastley v. Glenn*, 313 Pa. 130, 132, 169 A. 433, it was said that "Reading the verdict slip with the prefix, '. . . hearken to your verdict as the court has recorded it,' followed by an oral dissent, with or without poll, by a member of the jury *before*

*dismissal,* is not returning or recording a verdict as is required by law" (Emphasis supplied). In the present instance, the prefix merely called upon the jurors to hearken to their verdict "as the Court hath ordered it recorded" which presupposed that the verdict had not yet been recorded. In *Walters v. Junkins,* supra, it was stated that "After the jury have rendered their verdict, it is read to them, that they may say, whether the court have recorded it according to their finding. If any mistake should have occurred, it may be immediately corrected. To permit an alteration, *after the jury are dismissed,* would lead to great abuses . . ." (Emphasis supplied). It is implicit in what Chief Justice MAXEY said for this court in *Commonwealth v. Johnson,* supra, that the recording of the verdict does not become unalterable until the opportunity of the jury to correct or alter it has passed with "their dispersion." See also Bishop, New Criminal Procedure at §1003-2 and Abbott, Criminal Trial Practice at §737.

Subsequent to the denial of the defendant's motion for a new trial, his counsel obtained and filed in the court below the following affidavit: "William A. Elder, being duly sworn according to law, deposes and says that he is Prothonotary of the Court of Common Pleas of Mercer County, Pennsylvania, and was such at the time of the trial in the above entitled case; that he acted as the Clerk of Courts, at the request of Katherine Campbell, Clerk of Courts, who was absent, at the time the verdict was announced by the foreman in the above entitled case; that he did not not write the verdict in the minutes as the foreman read it; and that he had not written it or recorded it in the minutes or anywhere else at the time defense counsel requested that the jury be polled, and that the Court had made no comment or order prior to that time, except to say,

'Mr. Elder, read the verdict.'" The affidavit factually confirms what we think the record otherwise inferentially established.

The importance of strict adherence to long-established procedures, especially in criminal trials, was well accentuated by Chief Justice GIBSON in *Peiffer v. The Commonwealth,* 15 Pa. 468, 470, where a judgment of sentence of death for a conviction of murder in the first degree was reversed because the jury, after being empaneled and sworn, were, *with the consent of the prisoner's counsel,* allowed to separate. As to the *procedural* rule there involved, the eminent Chief Justice said that it "touches not matter of form, but matter of substance." The same can be said of a defendant's right to a poll of the jury which, by its verdict, has found him guilty of murder in the first degree with the penalty fixed at death.

The judgment of sentence is reversed and a new trial ordered.