## Commonwealth v. Andrasik

*William Panella, district attorney,* for the Commonwealth.

*Harry O. Falls,* for defendant.

McCRACKEN, *P.J.,* November 9, 1992—A jury found the defendant guilty of murder in the third degree. Her post-trial motions are now before us. Because of the complexity of the case and of the issues presented, we deem it appropriate to begin with a statement of the facts in the case.

The body of James Dean Lewis was discovered by police in the living room of his home at 611 John Street in New Castle on the morning of November 30, 1990. He appeared to have died of a gunshot wound in the head. The defendant had been living with Lewis in a common-law marriage for several years and had borne him two children. When the police and the ambulance personnel arrived at the home (about 7:30 in the morning), they found the defendant present with her children and several other relatives whom she had called before notifying the police. The body was lying on one side against a sofa with one arm under his head and a cigarette in

the other hand. The coroner's office and the police detective bureau were duly notified. An autopsy determined the cause of death to be a single gunshot wound to the right temporal area of the head.

As a result of police investigation, the defendant was arrested on December 2, 1990, and charged with criminal homicide. A preliminary hearing was held on January 2, 1991, at which time the district justice ordered the defendant held for court. An information charging her with the murder of James Dean Lewis was filed by the district attorney on February 11, 1991. Discovery motions were made and ruled on during March of 1991, and the trial began on November 19, 1991. During the trial the Commonwealth presented evidence tending to show that the defendant had shot the victim with a firearm (never recovered) during the early morning hours of November 30, 1990, and that she had previously been quarreling with him regarding his use of drugs and his association with drug dealers. The defendant's theory was that the victim had been shot by someone else, perhaps by a drug dealer on whom he had informed (he was an informant for the police), and that she had discovered his dead body on awaking that morning.

After four days of testimony, closing arguments and the charge were delivered on the morning of November 25, 1991, and the jury retired to deliberate at 12:23 p.m. They returned to the courtroom at 4:30 p.m. with a verdict. The verdict slip as it had been completed indicated that the jury had found the defendant not guilty of first degree murder but guilty of third degree murder, and that was the verdict announced by the tipstaff. But when the jury was polled at the request of defense counsel, juror 10 responded "not guilty" on the charge of third degree mur-

der. All other jurors responded "guilty." Defense counsel moved for an immediate mistrial, which was denied. The court then directed the jury to return to the jury room for further deliberations. Retiring again at 4:39 p.m., the jury gave notice at 6:22 p.m. that a verdict had been reached. They returned to the courtroom and rendered the same verdict as before: not guilty of first degree murder, but guilty of third degree murder. The jury was again polled, and this time all 12 jurors indicated assent to the verdict and it was duly recorded.

Post-trial motions were filed on December 5, 1991. In addition to the standard boilerplate contentions regarding the sufficiency and weight of the evidence, these motions allege error in the court's refusal to grant discovery concerning the status of the decedent as a drug informant; in ruling inadmissible certain defense evidence; in refusing the defendant's points for charge; in granting the Commonwealth's "dual inference" points for charge and emphasizing them repeatedly; in refusing to charge the jury on involuntary manslaughter; in polling the last two jurors after the tenth had said "not guilty;" in refusing to grant a mistrial after the poll; and in retiring the jury again with the identical verdict slip and the same possible verdicts, thereby effectively allowing them to reconsider their "not guilty" verdict on first degree murder. We will consider the issues raised in these motions in the order in which they are addressed in the defendant's brief.

## THE JURY POLL

The first series of issues raised by the defendant stem from the episode in which the verdict originally returned by the jury was revealed on a poll of the jury not to be unanimous which necessitated the retirement of the

jury for further deliberations. We begin by noting that the Pennsylvania Rules of Criminal Procedure expressly provide for the steps to be taken in such a situation. Rule 1120(f) provides: "Before a verdict, whether oral or sealed, is recorded, the jury shall be polled at the request of any party. Except when the verdict is sealed, if upon such poll there is no concurrence, the jury shall be directed to retire for further deliberations." The official comment to this rule states that section (f) provides for the polling of the jury and requires the judge to send the jury back for deliberations in accordance with *Commonwealth v. Martin,* 379 Pa. 587, 109 A.2d 325 (1954). That case established that before a verdict is officially recorded, the party against whom it is rendered is entitled to have the jury polled individually in order to assure that the verdict represents the unanimous conclusion of each juror. The point at which a request to poll the jury must be made is after the verdict has been announced but before it is recorded in order that a verdict which is shown not to be unanimous may be corrected by further deliberation before the jury is discharged. The record in the present case indicates that Rule 1120(f) was followed exactly. When the jury returned to the courtroom at 4:30 p.m. on November 25, 1991, the verdict slip which had been filled out and signed by the foreman was read aloud by the tipstaff. The court immediately asked defense counsel, "Anything, Mr. Falls?" and he replied, "May we have the jury polled, Your Honor, with regard to the verdict of murder, third degree?" (tr. 11-25-91 p. 95 11.19-22.) The court then directed the tipstaff to conduct the poll. Each juror in order was asked to rise and state whether he or she found the defendant guilty or not guilty of third degree murder. The first nine jurors all answered

"Guilty." (*Id.* p. 95 1.23—p. 97 1.11.) When juror 10 was asked to state her verdict she said, "Not guilty". At first, the court directed that the polling continue, and the tipstaff began to question juror number 11, but then the court, in an attempt to clarify the matter, said "Just a moment. Juror number 10, you understand this is to murder in the third degree. Was your verdict guilty or not guilty?" The juror asked "Right now?" and "At this point?" and then stated "I said, not guilty." The court then directed the poll to continue, and the last two jurors both said "Guilty." (*Id.* p. 97 1.12—p. 98 1.17.)

When the poll was complete, the court conducted a sidebar conference with counsel. The assistant district attorney urged the court to retire the jury for further deliberations in accordance with Rule 1120(f). The defense attorney moved for a mistrial, arguing that the sole dissenting juror would be placed under too much pressure during the additional deliberations. Eventually the court decided to deny a mistrial and recess the jury pursuant to the rule. At that point the jury was retired with this instruction: "Members of the jury, as I have instructed you previously, your verdict must be unanimous. It was not unanimous at this point in time so we're going to re-retire you to continue your deliberations. All right." (*Id.* p. 101 11.2-7.) About half an hour later, defense counsel argued to the court that a Superior Court precedent (to be discussed below) required the granting of a mistrial because the final two jurors were polled after the dissent of the tenth juror had been determined. The Commonwealth took the position that Rule 1120(f) had in any event been complied with, and hence there was no need of a mistrial. After a further discussion of other precedents, the court reached the conclusion that the continued polling

of the jury had not been error calling for a mistrial. By that time, the jury had arrived at a verdict, as indicated above.

The cases relied on by the defendant in support of her claim that a mistrial should have been declared are *Commonwealth v. Sanchez,* 363 Pa. Super. 499, 526 A.2d 790 (1987); *Matthews v. United States,* 252 A.2d 505 (D.C. Ct. App. 1969); *Williams v. United States,* 419 F.2d 740 (D.C. Cir. 1969); *United States v. McCoy,* 429 F.2d 739 (D.C. Cir. 1970), and *Commonwealth v. Spencer,* 442 Pa. 328, 275 A.2d 299 (1971). But they do not support her position. The federal cases, to begin with, are not binding on us; in addition, they are based on a federal procedural rule which gives the trial judge the option of either declaring a mistrial or requiring the jury to deliberate further. The Pennsylvania rule, by contrast, requires that the jury be sent out to continue deliberating and does not refer to a mistrial. This consideration greatly diminishes whatever persuasive authority the federal cases might otherwise have. The *Spencer* case does not deal at all with a poll of the jury. It deals with a special charge that was formerly given when a jury had reached a deadlock, but which is no longer permitted because of its potentially coercive effect. The defendant in this case cites *Spencer* for its holding that a charge which coerces or intimidates a jury is reversible error.[1] But it does not hold that making a jury deliberate until a unanimous verdict is reached is error. It is, in fact, the way to insure that the requirement of a unanimous verdict has been met. *Commonwealth v. Stufflet,* 276 Pa. Super. 120, 419 A.2d

---

1. *Commonwealth v. Wilmer,* 434 Pa. 397, 254 A.2d 24 (1969); *Commonwealth v. Holton,* 432 Pa. 11, 247 A.2d 228 (1968).

124 (1980); *Commonwealth v. Pemberton,* 256 Pa. Super. 297, 389 A.2d 1132 (1978); *Commonwealth v. Corbin,* 215 Pa. Super. 63, 257 A.2d 356 (1969).

As for *Sanchez, supra,* it is clear from a reading of the opinion that the error found by the Superior Court consisted in not sending the jury back to the jury room, but in continuing to interrogate the dissenting juror until she finally acquiesced in the decision of the majority. The pertinent portions of the trial transcript, reproduced in the Superior Court's opinion, confirm this. The poll of the jury indicated that the first four jurors agreed with the guilty verdict that had been announced. When the fifth juror was called, she answered, "Not guilty." She gave the same response a second time, when asked, "Do you agree with the verdict, yes or no?" But then when the trial judge asked for the third time if she agreed with the verdict, her answer was "Yeah." The remaining jurors were then polled, and all agreed with the verdict. The judge then returned to juror number five, and asked her (for the fourth time) "Do you agree with the verdict as announced?" She answered, "Yes." At the request of counsel, each juror was questioned directly to find the defendant either guilty or not guilty. When juror number five was asked, "How do you find the defendant on the charge of criminal conspiracy?" her response this time was, "Agree." (It eventually was revealed that this juror had a hearing problem.) When the question was repeated, she answered "Not guilty," but the judge continued to ask "Not guilty or guilty?" Over counsel's objection, the court asked one more time, "Will you please stand again, ma'am. I'm going to ask you how you found the defendant. I want you to answer me guilty or not guilty on each of these charges, do you understand that?" This time, she

answered "guilty" on all charges and the verdict was recorded as unanimous.

The error, according to the Superior Court, was the repeated and persistent questioning of the juror who was asked at least five times what her verdict was, until she finally changed it from "not guilty" to "guilty." Significantly, the court analyzed the situation in this way:

"At no time did the court stop the polling and order the jury to retire for further deliberations, as required by Pa.R.Crim.P. 1120(f). Instead, the court impermissibly continued to question juror number five until it obtained a response that comported with the responses of the other jurors. As a result, it is unclear whether the guilty verdict accurately reflects the conscience of each and every juror." *Sanchez, supra* at 504, 526 A.2d at 792.

That did not occur in the present case. The dissenting juror was not questioned repeatedly. The court merely asked her once more in order to be certain that she understood on which verdict (third degree murder) the jury was being polled. She, in turn, asked "Right now?" in order to verify that her decision at the present moment was being sought.[2] As soon as her position was understood, she was not questioned any further. Rather, the jury was retired in accordance with Rule 1120(f).

Thus, the authorities relied on by the defendant are not on point. Furthermore, it is clear from such precedents as *Commonwealth v. Fowler,* 259 Pa. Super. 314, 393

---

2. When the guilty verdict was first announced, there was an emotional reaction from the defendant and several of her relatives. The possibility that this could have caused juror number 10 to have second thoughts cannot be discounted.

A.2d 844 (1978) and *Commonwealth v. Pemberton, supra,* that sending the jury out again when the verdict is not unanimous is, in fact, the only correct procedure under Rule 1120(f). Far from being error, it is the proper and approved step to take.

The argument has been made, however, that even if it would not have been improper to send the jury back out when the dissent of juror number 10 had been discovered, it was nonetheless error to continue to poll the two remaining jurors before doing so. If we read Rule 1120(f) literally, we are easily led to conclude that continuing the poll is superfluous and unnecessary, because whenever it is determined that the verdict is not unanimous, the jury must, under the rule, be instructed to continue deliberating. But neither the rule nor any comment to it states whether this must be done immediately after a juror expresses dissent, or whether the poll may continue until all 12 jurors have been polled. Indeed there appears to be no case law specifically addressing this issue. (In *Pemberton, supra,* which approves of the practice of sending the jury out in the most unequivocal terms, there is no indication of which of the 12 jurors was the dissenter.)

The only way of resolving this issue appears to be by considering what possible difference, prejudicial to the defendant, could have resulted from polling two more jurors before retiring the jury. The defendant, with no citation of authority, speculates that the public revelation of the opinions of the last two jurors may have served to heighten the pressure placed on juror number 10 to acquiesce to the consensus of her fellow jurors. Presumably, according to this theory, once it is a matter of public knowledge that this particular juror is the lone dissenter,

she can more easily be intimidated into "following the herd" than if the exact number of dissenters are not known. This, however, is nothing but speculation.

What a poll of the jury reveals is nothing more than what the entire jury will know when it has retired for further deliberations. A non-unanimous jury must confront its numerical division in the jury room as a first step in the process of turning that division into unanimity. Presumably, nearly every jury deliberation in every trial begins with some divergence of opinion which, in the course of deliberations, eventually turns into a unanimous verdict. The jury is always instructed, before retiring, that they must consult with one another and deliberate with a view to reaching an agreement, whenever possible; that they should each be willing to express their own views, and also to listen to the views of their fellow jurors, that they should be ready, when necessary, to alter their opinion, but not to surrender an honest conviction merely for the sake of unanimity. (tr. 11-25-91 p. 90 1.11—p. 91 1.8.) If we can no longer assume that jurors follow these instructions to the best of their ability, but must instead speculate on the possibility that they will ignore them, then the jury system has practically lost its value.

If a jury when it originally retires is assumed to follow instructions, should this assumption evaporate when a verdict is returned and a poll finds it to be less than unanimous? If the jury has been capable of deliberating properly up to this point, does the revelation of lack of unanimity suddenly prevent them from continuing to deliberate under the same guidelines? If it is asserted that the problem is not that dissension amongst the jurors was disclosed but that the existence of one lone dissenter was revealed, then it should be asked: what if the poll had revealed juror number 12,

rather than number 10, to be the dissenter? Would the theoretical potential for 11 jurors to coerce or intimidate one juror be any different depending on the seat in which the lone juror is sitting? Yet, if it had been the twelfth juror, this would inevitably have been revealed in the poll, when the jurors were questioned in numerical order. Would the argument then be made that it is coercive to retire a jury that everyone knows is divided 11 to one? Such speculative hypothesizing cannot be a basis for overturning a verdict. There is, most importantly, no authority for finding error in the procedure followed here.

Defendant also claims that the court erred in not instructing the jury, when sending them back to continue deliberating, that they were not to reconsider their "not guilty" verdict on the charge of first-degree murder. Although there is no evidence that they did reconsider it, the suggestion is made that the 11 jurors in the majority may have intimidated the holdout juror into agreeing with them by threatening to reconsider the first-degree murder verdict if she refused to join their verdict as to third-degree murder. This again is nothing but sheer speculation. The jury had been instructed earlier that they were to consider first the charge of first-degree murder, then third-degree murder, and finally voluntary manslaughter. Both the charge of the court and the verdict slip sent out with the jury included instructions that the jury was to proceed from the highest offense to the lowest, stopping when a guilty verdict was reached on one charge. It would appear from the way in which the verdicts were written on the slip that these instructions were followed. There is no reason to assume that the jury did not continue to follow these instructions later when the poll revealed

a lack of unanimity on the third-degree verdict, hence it was that particular verdict, not the first degree verdict, which was shown not to be unanimous, and since the jury was retired in order to deliberate toward unanimity, we must assume that the jury considered the third-degree charge alone.

But even more importantly, the defendant has waived any possible objection on this basis. The record indicates that defense counsel never objected to sending the jury back out with the same verdict slip; nor did he ever ask that the jury be instructed not to reconsider their verdict as to first-degree murder. The question was brought up on oral argument whether the right to a fair trial can ever be waived. The answer is that, under the law of this Commonwealth, *any* trial error can be waived, and is waived, if it is not objected to while there is still an opportunity to correct it. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974); *Commonwealth v. Griffin,* 271 Pa. Super. 228, 412 A.2d 897 (1979). The former concept of "basic and fundamental error" justifying a reversal even without an objection or exception, enunciated in *Commonwealth v. Williams,* 432 Pa. 557, 248 A.2d 301 (1968), was eliminated in civil trials by *Dilliplaine v. Lehigh Valley Trust Company,* 457 Pa. 255, 322 A.2d 114 (1974) and in criminal trials by *Clair, supra.* See also, *Commonwealth v. Marlin,* 452 Pa. 380, 305 A.2d 14 (1973); *Commonwealth v. Morgan,* 448 Pa. 494, 295 A.2d 77 (1972). Since this issue was not raised in a timely manner by a contemporaneous objection, it is waived. *Commonwealth v. Pritchitt,* 468 Pa. 10, 359 A.2d 786 (1976); *Commonwealth v. Chuck,* 227 Pa. Super. 612, 323 A.2d 123 (1974).

Defendant raises one additional issue regarding the rendition of the verdict. The customary procedure in Lawrence County is for the foreman of the jury to hand the completed verdict slip to a court employee (sometimes the prothonotary and clerk of courts or one of her assistants; at other times the tipstaff) who, after allowing the judge to inspect the slip for proper form, proceeds to read the verdict aloud and asks the jury to confirm that it has been accurately read and is the verdict on which they have agreed. The defendant claims that this procedure violates Pa.R.Crim.P. 1120(b): "The verdict ... shall be announced by the foreman in open court." Since no contemporaneous objection to it was made, however, all we have said *supra* regarding waiver is equally applicable here. Furthermore, even if the issue had not been waived, we fail to see what possible prejudice the defendant could have suffered. The verdict slip was filled out and signed by the foreman. The poll of the jury on the second rendition of the verdict verified that the jury was unanimous. It should make no difference from the standpoint of due process whether one person or another performs the ministerial task of announcing the verdict in court. We also observe that in both *Commonwealth v. Wheeler,* 498 Pa. 374, 446 A.2d 892 (1982) and *Commonwealth v. Martin, supra* the same procedure was employed by the trial court as was employed here, and in neither case did the Supreme Court mention that there was any impropriety in allowing someone other than the foreman to make the ritual announcement. We thus conclude that no prejudicial error was committed in this matter.

## DISCOVERY

A petition for pre-trial discovery was presented by the defendant on March 8, 1991. After a hearing at

which it was determined that the Commonwealth had already responded adequately to certain of the requests, the court issued an order on March 18, 1991, denying the remaining requests including "The names and addresses of persons against whom the alleged victim provided information relating to illegal drug sales, ... Information that someone other than defendant may have been responsible for the death of the alleged victim, ... [and] information negatively affecting the credibility of a Commonwealth witness, Kelly Conley." The defendant maintains that disclosure of this information was required by Pa.R.Crim.P. 305.

To the extent that such information may have constituted evidence favorable to the accused and material to either guilt or punishment, then if it was in the Commonwealth's possession or control, its disclosure was required under Rule 305B(1)(a). But it is equally true that the Commonwealth can have no duty to disclose evidence which it does not possess or of which it is not aware. *Commonwealth v. Bonacurso,* 500 Pa. 247, 455 A.2d 1175 (1983), *cert. denied* 462 U.S. 1120, 77 L.Ed. 2d 1350, 103 S.Ct. 3090 (1983); *Commonwealth v. Bridge,* 495 Pa. 568, 435 A.2d 151 (1981). It was brought out at the hearing that the Commonwealth had no knowledge of anything adversely affecting the credibility of Kelly Conley. Defense counsel accepted this assurance. (tr. 3-15-91 p. 11 11.6-8.) It was also established that the Commonwealth had no evidence implicating someone other than the defendant and that there was no list of persons on whom the victim had informed. There was, accordingly, no way in which the Commonwealth could provide the defense with the information sought, information which could have been obtained through interviews with the

police officers involved, *Commonwealth v. Gelormo,* 327 Pa. Super. 219, 475 A.2d 765 (1984) (when both sides have equal access to the source of the information, mandatory discovery may not be used to compel the Commonwealth to obtain evidence for the defense).

There was no error in the denial of the discovery petition.

## EVIDENTIARY RULINGS

The defense offered to recall an earlier witness, Yvette Montgomery, on the fourth day of the trial. She was prepared to testify that, on the evening preceding the death of James Dean Lewis, she overheard a telephone conversation in which Kelly Conley was conversing with both Lewis and his brother Dennis (her boyfriend), and in which she mentioned that she and James Dean Lewis intended to travel to Akron, Ohio, to "set up" a drug dealer in an effort to help Dennis Lewis evade the criminal charges against him. (She gave this testimony outside of the jury's hearing so the court could rule on its admissibility.) The defense theory was that if James Dean Lewis had in fact informed the police about the dealer in Akron, and if the Akron dealer found out who had turned him in, this would have furnished the Akron dealer with a motive to kill Lewis, thus diverting suspicion from the defendant. But as the court ruled at the time, this would have involved excessive speculation on the jury's part. There was no evidence that the planned "bust" in Akron was actually carried out, or that the individual "busted" found out who had informed on him. For the jury to have drawn these inferences would have been unwarranted. The proposed testimony alone would not have been relevant to any issue in the case, inasmuch as it would not

have established any fact material to the case or made any fact at issue more or less probable. *Commonwealth v. Davenport,* 462 Pa. 543, 342 A.2d 67 (1975). It was therefore properly excluded from the jury's consideration.

## SUFFICIENCY AND WEIGHT OF THE EVIDENCE

In her post-trial motions of December 5, 1991, the defendant states that, "The evidence was insufficient as a matter of law to support the verdict," and that, "The verdict was against the weight of the evidence." This language does not, however, preserve any issue for review. The Superior Court held in *Commonwealth v. Holmes,* 315 Pa. Super. 256, 461 A.2d 1268 (1983) that

"a post-verdict motion, either that 'the evidence was insufficient to support the verdict,' or that 'the verdict was against the weight of the evidence,' will preserve *no* issue for appellate review unless the motion goes on to specify *in what respect* the evidence was insufficient, or *why* the verdict was against the weight of the evidence." *Id.* at 259-60, 461 A.2d at 1270. (emphasis in original)

This prohibition against boilerplate post-verdict motions was adhered to in *Commonwealth v. Whiteman,* 336 Pa. Super. 120, 485 A.2d 459 (1984) and in *Commonwealth v. Heckman,* 366 Pa. Super. 224, 530 A.2d 1372 (1987). See also, *Commonwealth v. Beckham,* 349 Pa. Super. 430, 503 A.2d 443 (1986). This rule applies not only to the argument in a brief but to the statement of an issue in a motion itself, as is clear from the statement in *Whiteman, supra,* that, "The same considerations which render boilerplate allegations objectionable when offered in support of post-verdict motions also make them unfit to serve in an appellate brief

as statements of the issues involved on appeal." *Id.* at 126, 485 A.2d at 462. Thus, boilerplate language must be avoided at all stages. We are therefore forced to conclude that all issues relating to the sufficiency and weight of the evidence have been waived.

## OTHER EVIDENTIARY RULINGS

The Commonwealth witness, Kelly Conley, who lived in close proximity to the house which the defendant shared with the decedent, testified that approximately two weeks before the fatal shooting, she had seen a handgun in his pocket when he was at her house. This evidence was ruled admissible at sidebar because, inasmuch as it showed that the decedent had possessed a firearm during a period of eight or 10 days before his death, would permit an inference that the defendant, with whom he was living, may have had access to it. There was evidence that the gunshot wound in the decedent's head could have been caused by a firearm of that type.

Evidence that a defendant could reasonably have had access to an implement with which the crime could have been committed is always relevant. *Commonwealth v. Akers,* 392 Pa. Super. 170, 572 A.2d 746 (1990) citing *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974). The question of the lapse of time between the observation of the gun and the crime affected only the weight of the evidence, not its admissibility. It was therefore not error to admit this evidence.

Finally, the defendant claims that the court erred in striking from the record a response in which she had expressed an opinion as to who might have been responsible for the murder. When on direct examination the defendant was first asked by her counsel, "Who did you

think might have killed him?" the Commonwealth objected, but the court allowed the witness to answer. Her response was, "It could have been black people, Billy Thomas, Jackie Recklaw." Counsel asked, "Why do you think black people could have killed him?", at which point the assistant district attorney renewed his objection at sidebar. The court then stated, "I don't know that she can render an opinion. She can testify to, he turned this one in, that one, threatened him, this, and she testified to that, but I don't think she can give an opinion," and then "Well, I'm going to strike it, reverse my ruling and strike it." Defense counsel inquired whether it would be permissible to ask the witness it she suspected that the death of the decedent was related to his status as a drug informant for the police. The court ruled that the witness could testify to facts from which the jury might draw that conclusion, but could not express an opinion. The jury was then instructed to disregard the witness's statement as to who might have committed the killing. (tr. 11-22-91 p. 92 1.19—p. 95 1.18.) The claim now advanced by the defendant to the effect that the testimony was stricken out of a groundless fear of injecting racial prejudice into the trial is completely meritless. As the court made it clear, the testimony was not admitted because it would have constituted an improper expression of opinion. Race had nothing to do with it.

The rule that a witness may testify only to matters of personal knowledge and observation and may not render an opinion is one of the oldest rules of the common law. *McCormick on Evidence,* 2d.ed. section 11 at 23. This rule has long been recognized in Pennsylvania. *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350 (1933); *Schuette v. Swank,* 265 Pa. 576, 109 A.

531 (1920); *Maloy v. Rosenbaum Company,* 260 Pa. 466, 103 A. 882 (1918). Except for a witness who has been qualified as an expert, testimony must be confined to facts, while opinions and conclusions are to be left to the jury. *Jamison v. Ardes,* 408 Pa. 188, 182 A.2d 497 (1962). It was on the basis of this rule that defendant was not allowed to testify as to her opinion of who might have committed the crime. It was error against the Commonwealth to overrule its objection to the question to the defendant, which elicited an opinion. Our reversal of that ruling cured the error.

We conclude, for all these reasons, that the defendant's post-trial motions are without merit and must be denied.

## ORDER

Now, November 9, 1992, the post-trial motions of the defendant, Paula Anna Andrasik, are hereby denied. The defendant will be scheduled for sentence. The Adult Probation Office will conduct a pre-sentence investigation.